GEORGE CRONK, Guardian, Appellee, v. AMERICAN SURETY COMPANY OF NEW YORK, Appellant, et al., Appellee.

No. 39366.

MAY 14, 1929.

*J. W. Morse* and *Carr, Cox, Evans & Riley,* for American Surety Company of New York, appellant.

*William S. Johnston,* for plaintiff, appellee.

*S. G. Bammer,* for George W. Canon, appellee.

MORLING, J.—Defendant Surety Company does not question the propriety of the pleadings or of plaintiff's resort to equity, rather than to the probate court. Defendant in answer sets up two reports to the probate court, showing the deposit of funds in the First National Bank of Armstrong, and alleges their ap-

proval. The reports and orders of approval, if made, do not appear in evidence.

Defendant Canon was appointed guardian in February, 1921, and the bond in question was given and approved during the next two months. He received the money in controversy that same year, and without authority from the court, then deposited it in the First National Bank of Armstrong.

About February 19, 1925, Mr. Peisen, a representative of the defendant Surety Company, told the guardian (as Peisen says in affidavit in support of motion for new trial) that he should invest the funds to comply with Section 12772 of the Code of 1924. (This section provides that, where investments of funds are to be made by guardians or others, and no mode of investment is pointed out by statute, they may, under order of the court, be made in Federal, state, Federal farm loan, municipal, county, or drainage bonds, or bond and mortgage on real estate.) Defendant guardian testifies:

"Q. Mr. Peisen told you that the money was not safe, or in words to that effect, in the bank, and you better have a court order? A. Well, something along that line,—yes. Q. And you understood at that time that the First National Bank was unsafe, and you better protect yourself by getting the court order,—now isn't that true? A. No, I don't really think so, although I did not single out that bank. I thought the First National Bank was as strong a bank as there was in the country.

"The Court: You had some suspicion at that time, didn't you? A. Yes. * * * I did have some suspicion that the bank might not be safe at the time the court order was obtained. The purpose of getting this order was because of the fact that a representative of the Surety Company came and warned me as to the condition of banks. At one time, I received a letter from the Surety Company to the effect that the money ought to be taken out of the banks. That was before the court order was obtained. * * * Q. You didn't make any endeavor to take it out, even after he [Peisen] had advised you of the bad condition of the bank? (Objected to as assuming.) A. No."

A letter set out in defendant's motion for new trial, from the manager of the Surety Company to the attorney for defendant guardian, dated October 8, 1925, states:

"On July 31st, you very kindly advised us that you were planning on securing a court order at your next term of court, authorizing the deposit in the bank, and that the account would be withdrawn in the form of a cashier's check while this court order was being secured. Will you kindly advise * * *."

The answer of the attorney on this letter is:

"* * * I do not know what to do, as Mr. Canon does not want to acquiesce in the plan which you had suggested, as he says that the bank in which this money is deposited is perfectly sound and safe, and he does not want to do anything that would cast the least reflection upon this bank * * *."

A letter from the Surety Company's manager, dated October 27, 1925, says:

"* * * Will you please explain to Mr. Canon that the action we have requested him to take is the same as we ask that all fiduciaries whom we bond to take and is not intended in any way as a reflection on his depositary bank. It is simply an additional protection that we feel that all fiduciaries should have. * * *"

Defendant guardian also says:

"Q. You answered Mr. Johnston's last interrogatories that you didn't make any endeavor to remove the funds after Mr. Peisen told you banks were in an unsafe condition. Did he tell you anything about the First National Bank of Armstrong? A. Not singled out as a bank, but it was only generally speaking. Q. Did you have any information from any person that the First National Bank of Armstrong, Iowa, was in an unsafe condition? A. No. I did not make any personal investigation to ascertain whether or not the bank was in good condition. I didn't talk with Mr. Robinson, bank cashier, very recently, but he told me, not a great while before this, that the bank was in better condition than it had been for several years. That was a month or so after they took over the State Bank. * * * The conversation I had with Mr. Robinson was about six months after he took over the State Bank. It was after I got the court order. Q. You had been hearing rumors about this bank, had you not? A. I heard rumors about all the banks. There were rumors to the effect that this bank was insolvent, and not strong. I talked

to Mr. Robinson about that very thing, and he said, 'They will never close this bank.' Those rumors had been going around Armstrong for several months. Q. And they had been going around there before you ever obtained this order,—isn't that a fact? A. No, I don't think so.''

The guardian says that Mr. Peisen ''told me to take the money out of the bank. Later, a letter came, in which they offered to buy government bonds for me. Mr. Peisen did not suggest getting a court order at that time. The first time I heard about a court order was just prior to the time it was obtained. Q. And you obtained the court order then in order that you could protect yourself and the surety company, in the event that the money remained in the bank and the bank became insolvent, —isn't that so? A. Yes. Q. And you talked it over with your attorney about that, didn't you? A. Yes. * * * And you were afraid to leave this money in the bank in the First National Bank without having a court order to protect yourself,—isn't that right? A. Yes. * * * And you never appeared before the court, asking for any designation, until after the time that you knew that this bank was not in a safe condition for the deposit of these funds,—is that right? A. Yes. * * *''

He also testifies that he told Mr. Peisen that ''this bank is as good as any bank in the country. * * * I said I could not buy bonds with this money, and if I had them, I wouldn't know where I could keep them. * * * It was after that * * * the head man of the Des Moines, Iowa, office of the Surety Company * * * said: 'I am coming down to Estherville to see Mr. Bammer' [guardian's attorney] * * * in a few days another man came to see me, * * * and wanted to get a court order. * * *

''The Court: Just what did he say about that, can you remember? Just as nearly as you can, how he expressed it and what he said? A. Well, he said that that would relieve him of responsibility of this money, if the bank failed. * * * He said, 'I will go back to Estherville with a blank,' wherever Judge Davidson was, 'and bring it over here, for you to sign.' That was an application for order; so I walked up to the bank with him and signed the application. * * * He took it and went away, and the next day he came back, and then he had Davidson's court order. * * *

"The Court: You told me before, sometime before this order was made, if you didn't know that this bank was in an uncertain condition, you had your suspicions. That is true, is it, Mr. Canon? A. Yes.

"The Court: As to this particular bank, now; I am not speaking about all the banks in Iowa you talk about. I am talking about this bank. .You had your suspicions about whether this bank, as you would say, would weather through? A. Yes.

"The Court: * * * Did you have this suspicion before this man came and talked to you and asked you to get this order, or did that have something to do with the suspicion? A. No. I had it before. I thought that, towards the last end, the bank was gaining; I thought it had passed the worst of it. That is, prior to Mr. Robinson's death.

"The Court: Did you have any reason to think that, except the statement made to you by Mr. Robinson? A. No, I don't think so. I thought the general conditions were getting better throughout the country.

"The Court: All the banks were getting better? A. Yes.

"The Court: Is it a fact, or not, that there was common talk on the streets of that little town of Armstrong about this First National Bank, and whether it would pull through, and whether it was safe or not; or was there talk that it was not safe? Did you hear talk of that kind? A. Why, you always hear talk of that kind.

"The Court: Mr. Canon, don't speak in generalities. I am asking you the question. Did you hear talk of that kind about that bank? A. Yes. * * * As quick as the order was entered, we took the money out of the bank, which was $8.00 at that time, and as quick as the order was served on the bank, I deposited the money again. The balance of the money was in a savings account. That had been true during all of the time, and continued so up to the time the bank closed. I did not change the character of the deposit in the bank after the order was secured. * * * Practically all of my checks were indorsed by some representative of the American Surety Company. I thought this bank was getting stronger. At the time I got this court order, I thought it was just as good as it had been." -

The guardian also testifies that he did not personally appear,

and that no witnesses that he knew of appeared when the application was made; that he did not then think the bank was embarrassed financially; that he thought it was as strong a bank as there was in the country; that he did have some suspicions.

"Q. And the purpose of getting this court order was because of the fact that a representative of the Surety Company came to you and warned you as to the condition of the bank,—isn't that correct? A. Yes."

He says that the application is the only representation that he made to the court; that he made no oral statement; that the representative of the company said "that would relieve him of responsibility of this money if the bank failed." The guardian's attorney testifies that the guardian did not come to him personally and ask him to present the matter to Judge Davidson, but that Mr. Lang, of the Surety Company, "said that he had talked with Mr. Canon; that they wanted to have an application made to the court and the court order obtained." The application merely states that the guardian has on hand $3,200 and that no bank has been designated as depositary, and asks that an order be entered, designating a suitable bank, and that he be directed to deposit the funds in the First National Bank of Armstrong.

The argument is directed largely against the statement of the court in his opinion that the Surety Company knew or believed that the bank was in an uncertain condition, if not insolvent, and against the finding that the Surety Company knew of the unsafe condition, and, together with the guardian, perpetrated a fraud upon the court in withholding the facts and procuring the order. The Surety Company filed a motion for new trial, which is aimed at this finding. The appellant argues, and its motion for new trial sets out in affidavits, that it did not know of the insolvent condition of the First National Bank; that what the company did, it did in good faith, merely by way of precaution, in pursuance of its general policy for the protection of all concerned; that it was surprised at the turn that the case took at the trial, and was not prepared to meet the charges against it. Even if we pass the obvious proposition that the Surety Company made no application for continuance, or for time to obtain its proof, the conclusive answer to appellant's contention in this connection is that the court is dealing primarily with the guardian.

If the guardian is in default, the Surety Company is liable on its bond. The knowledge or intent of the Surety Company is only incidentally involved. If its good faith and want of knowledge are conceded, the facts remain that the guardian, before this order was obtained, did have information that the First National Bank of Armstrong was not considered safe; that he had been advised to take his ward's money out of the bank and invest it in securities authorized by law, and that he had refused to do so; that the Surety Company later asked him to apply for an order authorizing deposit in the bank, and to this the guardian objected that he did not want to cast reflection upon the bank. It is true that the bank continued in operation almost a year after the order was obtained, but the talk that the guardian claims to have had with Mr. Robinson was after the order was made. The application was filed November 24, 1925, and order entered November 25, 1925, apparently on merely formal presentation.

A guardian in good faith, exercising ordinary intelligence, care, and prudence, may deposit temporarily the funds of his ward in a bank which he has no reason to believe to be unsafe; but the guardian must act in good faith, and he must exercise ordinary intelligence, care, and prudence. *In re Estate of Wisner*, 145 Iowa 151; *Des Moines Sav. Bank v. Krell*, 176 Iowa 437; *Incorporated Town of Conway v. Conway*, 190 Iowa 563; *In re Estate of Ring*, 132 Iowa 216; *Leach v. Beazley*, 201 Iowa 337; *Officer v. Officer*, 120 Iowa 389; *In re Estate of Workman*, 196 Iowa 1108; *Andrew v. State Bank of New Hampton*, 204 Iowa 878; 28 Corpus Juris 1145. An authorization to deposit may result from an order made after the deposit is made. *Robinson v. Irwin*, 204 Iowa 98. The nature of the deposit is not shown, further than that it was in savings account, and had existed for 4 years. Inferentially, this was an investment at interest, rather than a temporary deposit for safe-keeping. See *Andrew v. Sac County State Bank*, 205 Iowa 1248; *Tucker v. Stewart*, 121 Iowa 714, 720. It was not such an investment as the law authorized. The guardian was so informed by his surety. The order in question was merely an intermediate order. It was presented to the judge in another county, without notice to the ward or to anyone who would have an interest in protecting him. It is clear from the evidence that there was in fact no hearing. It cannot be assumed that the judge would have signed the order if he had

had the information which the guardian admits that he had,—if the judge had known that the money was already on deposit in savings account, and had been for four years; that the guardian suspected the bank's solvency, and had been advised by his surety to withdraw the money from the bank and invest it in securities authorized by law; that he had refused to do so; that the deposit was in a savings account; that there was doubt about its safety there; and that the purpose of the guardian and his surety was to protect themselves. *Tucker v. Stewart,* 121 Iowa 714, 721; 24 Corpus Juris 1036. It is frivolous to say that the purpose of the guardian in getting the order to authorize deposit of funds in a bank of which he was suspicious was to protect the ward. It was to protect himself. The application did not state to the court that the money was already on deposit in the bank. It stated "that, as such guardian, he has on hand the sum of $3,200 belonging to his said ward; that no bank has been designated as a depositary for said funds." It is not to be presumed that a judge sitting in another county, presented with the guardian's application that "he has on hand the sum of $3,200 belonging to his ward, that no bank has been designated as depositary for such funds," knew that there was a previous report on file showing the money to be on deposit in the bank in which he was asking authority to make deposit, even though such filing had been proved.

It is argued that there is no proof that the bank was in fact insolvent when the reports on the subject were current or the order signed. But the guardian had received the ward's money. His duty was to return it when called for. He deposited it not merely temporarily, in good faith, but in a savings acount, without authority. He was afterwards informed that the bank was of doubtful solvency. He was advised to withdraw the money and to invest it in such securities as the law permitted. He made no effort to protect his *cestui que trust.* He seems rather to have preferred to protect the bank, and at the instigation of his surety, procured an order to protect himself. He must be charged with the consequences of his lack of common prudence and good faith. The defendant guardian's own testimony convicts him of negligence and bad faith. The matters set out in the motion for new trial emphasize, rather than mitigate, the evidence against him.

The decree was that which the evidence required. There was no error in overruling the motion for new trial.—*Affirmed.*

ALBERT, C. J., and STEVENS, DE GRAFF, and WAGNER, JJ., concur.