IN RE TRUSTEESHIP UNDER THE WILL OF MICHAEL RIORDAN.

JOHN RIORDAN, Appellee, v. JANE RIORDAN et al., Appellants.

No. 41798.

APRIL 4, 1933.

REHEARING DENIED NOVEMBER 17, 1933.

Schuyler W. Livingston, for appellant Detroit Fidelity & Surety Co.

Edmund D. Morrison, for appellee Eardley Bell, Jr.

Wilson & Wilson, for L. A. Andrew, receiver.

Ralph H. Munro, for appellees Robert J. Riordan and others.

KINTZINGER, J.—On April 8, 1930, the Washington Loan & Trust Company was appointed guardian of the "Riordan trust", and filed a bond of $25,000 signed by the Detroit Fidelity & Surety Company, appellant, as surety.

On the day of its appointment, the Washington Loan & Trust Company received $21,773.94 in cash for the Riordan trust. This amount was immediately deposited in its own personal account in the Commercial National Bank, but not in its capacity as trustee.

The Washington Loan & Trust Company closed its doors and L. A. Andrew was appointed receiver thereof on October 5, 1931. Thereupon, the company resigned as trustee.

On December 9, 1931, the Washington Loan & Trust Company, trustee, filed its final report in the Riordan trust estate. Therein it took credit for $4,151.42 alleged to have been paid for the purchase of four county bonds, and $16,000 alleged to have been paid for the purchase of three mortgages executed by Mr. and Mrs. Kallaus, Mr. and Mrs. Miller, and Mr. and Mrs. Schantz.

On December 14, 1931, Eardley Bell, Jr., was appointed successor trustee of the Riordan trust, and duly qualified. The new

trustee filed objections to the final report of the Washington Loan & Trust Company, trustee, on the following grounds:

1. Because said trustee converted the $21,773.94 received on April 8, 1930, to its own use by depositing it in its own personal account in the Commercial National Bank where it was commingled with its own personal funds and those of other estates.

2. Because the trustee pretended to invest the moneys of this trust in certain county bonds and real estate mortgages belonging to the Washington Loan & Trust Company.

3. That on May 26, 1930, the Washington Loan & Trust procured an order of court authorizing said investments, by concealing the fact that such securities were the property of the Washington Loan & Trust Company itself.

The new trustee claimed that all such investments were fraudulent and void, and he elected to treat them as such because it was an attempt of the trustee to purchase securities from itself.

These allegations were denied by the old trustee and its surety, the Detroit Fidelity & Surety Company, and they, in answer and cross-petition, allege: That the Washington Loan & Trust Company, as trustee, on May 26, 1930, secured an order of court authorizing the purchase of three mortgages aggregating $16,000 and executed by Mr. and Mrs. Miller, Mr. and Mrs. Schantz, and Mr. and Mrs. Kallaus, and four county bonds of $4,151.42; that pursuant to said order, the trustee claimed to have purchased from J. M. Bratten, J. G. Maxwell, and L. F. Woodburn, trustees, the Schantz note and mortgage of $5,500, the Miller note and mortgage of $2,500, and the Kallaus note and mortgage of $8,000; that such investments were legal; that there is no liability to the new trustee; that the final report be approved; and that L. A. Andrew, receiver of the Washington Loan & Trust Company be ordered to deliver to Eardley Bell, the new trustee, all securities in his hands for the credit of the Washington Loan & Trust Company, trustee.

The surety further asked that, in the event the court holds the surety liable on its bond for any part of the trust funds, it be subrogated to the rights of the Washington Loan & Trust Company and its receiver in any securities involved.

The new trustee denies the allegations of the cross-petition relating to the alleged investments, and re-alleges the grounds of objection made to the final report.

He further alleges: that the Schantz, Miller, and Kallaus notes and mortgages alleged to have been purchased by the Washington Loan & Trust Company, as trustee, from J. M. Bratten, J. G. Maxwell, and L. F. Woodburn, trustees, were in fact the property of the Washington Loan & Trust Company and never had been transferred to said alleged trustees; that the application for, and order authorizing the investment of, said funds were fraudulently made and obtained by willfully concealing the actual facts from the court; that the Washington Loan & Trust Company was then individually the legal title holder to all of said securities; that the court had no power to permit any deposit of the trust funds in the Washington Loan & Trust Company, or to permit said company to transfer the legal title of any of the moneys of the trust to itself, or to purchase such securities from itself; that the order of court was void, and of no protection to the trustee, or the surety on its bond.

L. A. Andrew, receiver of the Washington Loan & Trust Company, alleges that all investments made by the Washington Loan & Trust Company were legal, and that he is not in any manner liable to the new trustee.

The court also found that the Washington Loan & Trust Company had commingled the assets of its own with the assets of other estates of guardians and administrators which it was handling, and that it being impossible to determine the equitable rights of all of such parties of interest in this action, it therefore authorized the Detroit Fidelity & Surety Company to file its claim of intervention in the receivership of the Washington Loan & Trust Company for adjudication therein.

The lower court disapproved the final report of the Washington Loan & Trust Company, as trustee; sustained the objections of the new trustee, and found the Washington Loan & Trust Company and the surety on its bond liable to the Riordan trust in the sum of $24,158.19, less a credit of $1,743.65 for moneys advanced, and rendered judgment against both for $22,314.54 and interest from February 5, 1932.

The evidence shows that on April 8, 1930, the Washington Loan & Trust Company, trustee, received for the Riordan trust estate the sum of $21,773.94; that this money was immediately deposited in the Commercial National Bank, in the personal account of the Washington Loan & Trust Company, with other funds belonging to it

and other estates; that said moneys were commingled with all other moneys of the said Washington Loan & Trust Company and moneys of other estates without any segregation whatsoever; that these funds were used by the Washington Loan & Trust Company in its own business.

The testimony further shows that the Washington Loan & Trust Company, trustee, filed an application with the district court for authority to invest in the following securities: Mr. and Mrs. Miller note and mortgage of $2,500; Mr. and Mrs. Kallaus note and mortgage of $8,000; Mr. and Mrs. Schantz note and mortgage of $5,500; 2 M Louisa county bonds and in 2 M Franklin county bonds. That these securities were all in the name of the Washington Loan & Trust Company; that they were in the hands of Bratten, Maxwell, and Woodburn as agents of the Washington Loan & Trust Company; that the notes, mortgages, and bonds referred to were executed to the Washington Loan & Trust Company long before it was appointed trustee of the Riordan trust.

The evidence shows that Bratten et al. were simply holding these securities as a matter of convenience and as agents for the Washington Loan & Trust Company; that none of the trust funds were ever paid for them, either before or after securing the order for their purchase. They had been purchased by, and were owned by, the Washington Loan & Trust Company long before any order of court was made authorizing the trust company, trustee, to buy them; they were then the property of the Washington Loan & Trust Company.

It was conceded by the trustee that the $4,000 worth of county bonds were purchased by the Washington Loan & Trust Company, as trustee, from itself individually, by charging them to the Riordan trust account.

After the court order was made, these securities were secured from said three alleged trustees by the Washington Loan & Trust Company, and by that company in turn assigned to itself as trustee of the Riordan trust. No cash was paid therefor, although the evidence showed some other personal securities held by the Washington Loan & Trust Company were substituted therefor; but such other substitutes had never belonged to the Riordan trust. The securities which they purported to purchase for the Riordan trust had been executed to the Washington Loan & Trust Company; they belonged to the Washington Loan & Trust Company, and were assigned by

it to the Washington Loan & Trust Company, *trustee* of the Riordan trust.

The books of the Washington Loan & Trust Company show that the Riordan trust had a credit of $21,548.94 until July 12, 1930. The final report of the trustee shows that on July 12, 1930, it took credit for $4,151.42 county bonds, and $16,000 for the Kallaus, Miller, and Schantz notes and mortgages, claimed to have been purchased for the Riordan trust. No funds of the Riordan trust were ever paid therefor.

The evidence also shows that the facts in relation to the securities proposed to be purchased by the trustee for the Riordan trust were *not* set out in the application for authority to purchase; that such facts were fully known by the trustee.

The new trustee has repudiated the alleged pretended investments and elected not to ratify the action of the old trustee in making them.

The record also shows that the trustee, after the pretended purchase thereof, resold the Kallaus mortgage of $8,000 and 3 M county bonds, without any order of court whatever; and, instead of turning in cash therefor, simply gave the trustee credit therefor on its book account.

I. It is claimed that these securities were purchased by the trustee because of a charge made against the Riordan trust upon the books of the Washington Loan & Trust Company on July 12, 1930. If this could be considered a purchase, the most that could be claimed for it would be, that the trustee purchased them from itself.

The law is well settled that a trustee can neither borrow from, buy from, nor sell to, himself. Such transactions are void as against the *cestui que* trust.

This rule is well established and inflexible, and is to the effect that a trustee cannot legally purchase on his own account that which his duty or trust requires him to sell on account of another; nor purchase on account of another that which he sells on his own account. He is not allowed to unite the two opposite characters of buyer and seller. In Michoud v. Girod, 4 How. 503, 555, 11 L. Ed. 1076, the court says:

"The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents,

public and private; but the value of the prohibition is most felt, and its application is more frequent, in the private relations in which the vendor and purchaser may stand towards each other. The disability to purchase is a consequence of that relation between them which imposes on the one a duty to protect the interest of the other, from the faithful discharge of which duty his own personal interest may withdraw him. In this conflict of interest, the law wisely interposes. It acts not on the possibility, that, in some cases, the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty. It therefore prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another, and from purchasing on account of another that which he sells on his own account. In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests, when he is the seller or buyer on his own account, are directly conflicting with those of the person on whose account he buys or sells."

This is the general rule, and has been repeatedly followed in this state. In re Holley's Estate, 211 Iowa 77, 232 N. W. 807; Bank of Old Dominion v. Dubuque & Pacific R. R. Co., 8 Iowa 277, 74 Am. Dec. 302; Sypher v. McHenry, 18 Iowa 232; Pearson v. Taylor, 37 Iowa 331; Linsley v. Strang, 149 Iowa 690, 126 N. W. 941, 128 N. W. 932; Walker v. Walker, 127 Iowa 77, 102 N. W. 435; St. Paul Trust Co. v. Strong, 85 Minn. 1, 88 N. W. 256; In re Skinner's Estate, 215 Iowa 1021, 247 N. W. 484.

In the case of In re Holley's Estate, 211 Iowa 77, 232 N. W. 807, 809, we said:

"One of the most familiar doctrines of the law of trusts is that a trustee cannot purchase from himself, or at his own sale. He cannot lawfully be the seller and the buyer in the same transaction. * * * This doctrine rests upon the ground of public policy. The law does not stop to inquire into the fairness of the sale, or the adequacy of price, but stamps its disapproval upon a transaction which creates a conflict between the self-interest and integrity of the trustee. The trustee is clearly disabled from becoming a purchaser of the trust estate, whether the *cestui que* trust be an infant or an adult, and whether the sale be public or private. * * * The

doctrine applies, though the purchaser be one of several cotrustees. * * * It matters not whether the sale be made with or without the sanction of judicial authority. * * * The rule is binding upon district courts, and its force and effect cannot be destroyed by a preliminary order granting the trustee permission to become a purchaser, nor by approving a sale to him. * * * The prohibition that a trustee cannot be the seller and buyer in the same transaction acts, not on the possibility that, in some cases, the sense of duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence and supersede that of duty."

On this branch of the case, we believe this comes squarely within the doctrine announced in the above-quoted case.

It was the finding of the lower court, and it is the finding of this court, that the securities alleged to have been purchased for the trust estate were in fact the securities of the Washington Loan & Trust Company. There is no testimony in this record whatsoever showing that any of the moneys of the trust fund were actually traced into the securities. As shown by the evidence, the securities had been purchased by the Washington Loan & Trust Company before that company was ever appointed trustee for the Riordan trust.

It was the finding of the lower court, and it is the finding of this court, that the facts as to the ownership of the securities attempted to be sold to the Washington Loan & Trust Company, trustee, by itself were concealed from the court; that the trustee did not act in good faith in obtaining such order, and thereby constituted fraud on the court. As shown by the authorities herein cited, a sale of his own property by a person to himself as trustee is invalid for the reasons announced in the cases referred to.

When such an order of court is fraudulently procured it may be set aside. See In re Lawson's Will, 215 Iowa 752, 244 N. W. 739; Bennett v. Ryan, 206 Iowa 1263, on page 1268, 222 N. W. 16; Cronk v. American Sur. Co., 208 Iowa 267, 225 N. W. 454. In In re Lawson's Will, 215 Iowa 752, on page 758, 244 N. W. 739, in discussing this question we said:

"Moreover, had the trustee, in making such application for the order of court in question, acted fraudulently and in bad faith and thereby obtained the approval of his actions by overreaching and

underhandedness, he would not be protected when the proper attack is made on his actions. Upon this subject, we said in Bennett v. Ryan (206 Iowa 1263), supra, on page 1268 [222 N. W. 16, 18]: 'It goes without saying that the guardian must act in good faith in obtaining such an order, and that such order may be later set aside upon the ground of the fraud or bad faith of the guardian in obtaining the same'."

It was the finding of the lower court, and it is the finding of this court, that the order authorizing the purchase of said securities was void and of no force and effect.

We believe there is no escape from the conclusion that the Washington Loan & Trust Company, and the surety on its bond, is liable to the new trustee for all the funds coming into the hands of the trustee, less the amounts actually paid out for *bona fide* expenses as found by the lower court.

II. It is also claimed by appellee that the deposit of the trust funds in the individual and personal account of the Washington Loan & Trust Company was wrongful under the statute and common law; that such deposit in the individual account of the Washington Loan & Trust Company, where it was commingled with its own funds and those of other *cestui que* trusts, made the trustee liable for a conversion of said funds. It is the settled law that, where trust funds are deposited in the individual account of the trustee, the *cestui que* trust has the right to elect to sue the trustee for the conversion, or he may pursue the trust funds and establish a preference thereto if they can be traced.

That a trustee is required to keep trust funds segregated from his own, see section 9290 and the following cases: St. Paul Trust Co. v. Strong, 85 Minn. 1, 88 N. W. 256; Judd v. Dike, 30 Minn. 380, 15 N. W. 672; Owsley v. Owsley (Ky.), 77 S. W. 394; First Congregational Soc. v. Pelham, 58 N. H. 566; MacGregor v. Mac-Gregor, 9 Iowa 65; 26 A. L. R. 6; 26 R. C. L. 1354.

In view of the conclusions reached on the preceding questions in this case, it is unnecessary to discuss this branch of the case further.

The lower court also found that the Detroit Fidelity & Surety Company was equitably entitled to subrogation to any rights of the trustee in said pretended investments as they existed prior to the repudiation thereof by the new trustee, and that said subro-

gation be had only upon the payment of all moneys found due said trust. Such is also the finding of this court.

The receiver is a party to these proceedings, and, in view of the unsettled and involved condition of the evidence with reference to the rights of the trustee in any of said pretended investments as they existed prior to the repudiation thereof by the new trustee, that question is remanded to the lower court for determination. The parties are in court and there is no need of commencing a new proceeding.

It is the finding of this court that Eardley Bell, Jr., trustee of the Riordan trust, is entitled to judgment against the Washington Loan & Trust Company and against the Detroit Fidelity & Surety Company, cross-petitioner, surety on its bond, in the sum of $22,314.54 with interest at 6 per cent from the 5th day of February, 1932, and costs in this and the lower court, as awarded by the lower court.

The judgment of the lower court is affirmed, and the case remanded for the purposes herein set forth.—Affirmed and remanded.

All Justices concur.