IN RE ESTATE OF NORRIS ENFIELD.

HEIRS OF NORRIS ENFIELD, Appellees, v. E. H. HANSON, Administrator, Appellant.

No. 41907.

DECEMBER 12, 1933.

Price & Burnquist, and F. S. Lovrien and D. F. Coyle, for appellant.

C. W. Garfield, and Thomas & Loth, for appellees.

STEVENS J.—■ Appellant was appointed, and assumed the duties as, administrator of the estate of Norris Enfield, deceased, on

or about August 30, 1930. On that date and until the bank closed September 11, 1931, he was the cashier and manager of the Peoples Savings Bank located at Hardy, Iowa. At the time of his appointment, decedent was a depositor in the aforesaid bank. He also had funds deposited in another bank. These funds were withdrawn and all of the cash assets of the estate deposited in the bank of which appellant was the cashier. Practically, the sole question presented for review on this appeal is the sufficiency of the evidence to sustain the finding and judgment of the district court. The case is not triable *de novo* in this court, and the finding and conclusion of the trial court upon all material issues of fact have the weight and effect of the verdict of a jury. Recognizing this rule, counsel for appellant urged the court to make a careful study and analysis of the entire record. This we have done.

There is neither charge nor proof of fraud in any transaction on the part of appellant. It is alleged that he was negligent in depositing the funds of the estate in the Peoples Savings Bank and in failing to properly look after and preserve the same. The duty of an administrator or other trustee in such cases is well settled in this state. Such officers are not insurers of the safety of the funds coming into their possession by virtue of their respective offices, but they must exercise that degree of care and prudence with reference thereto that ordinarily prudent men exercise in regard to their own affairs. Officer v. Officer, 120 Iowa 389, 94 N. W. 947, 98 Am. St. Rep. 365; In re Estate of Workman, 196 Iowa 1108, 196 N. W. 35; Cronk v. American Surety Co., 208 Iowa 267, 225 N. W. 454; In re Skinner's Estate, 215 Iowa 1021, 247 N. W. 484; In re Riordan's Trusteeship, 216 Iowa 1138, 248 N. W. 21.

As stated, appellant was the cashier and general manager of the Peoples Savings Bank. He was charged, therefore, as a matter of law, with knowledge of the bank's financial condition. Leach v. Beazley, 201 Iowa 337, 207 N. W. 374; Baumchen v. Donahoe, 215 Iowa 512, 242 N. W. 533; In re Guardianship of Aasheim, 212 Iowa 1300, 236 N. W. 49.

The Peoples Savings Bank was located in a splendid agricultural community, was a going concern, and continued to be such for approximately a whole year after appellant became administrator. Prior to his appointment, a voluntary assessment of approximately 100 per cent had been made, and paid by the stockholders. The capital of the bank was $15,000. Commencing with

March 11, 1931, there was a gradual shrinkage in the bills payable and the individual deposits in the bank. Two or three months later there began an increase in the bills payable. On March 11, 1931, the bank had bills receivable in the aggregate sum of $240,120.85; cash, $16,444.03; individual deposits, $122,360.09; time deposits, $67,193.87; savings deposits, $34,865.69; and bills payable, $16,500. On September 11, the date on which the bank closed, the bills receivable, cash and all forms of deposit had materially declined. They were on that date as follows: Bills receivable, $216,981.75; cash, $8,016.16; individual deposits, $94,984.43; time deposits, $50,382.89; savings deposits, $25,696.53,—while on said date, bills payable had increased to $36,000.

During the period between the above dates, notwithstanding the indicated cash payments to the bank, several loans which necessitated the deposit of bills receivable as collateral were made to the bank. There were but few days during the entire period on which the balance of cash available for that purpose could have been drawn on to make distribution of the funds of the estate and leave sufficient to continue the bank's business. For example, the cash on hand on occasions fell below $7,000 and even below $6,000, and on numerous dates, it was less than the amount found by the court to be due the estate. Some of the better bills receivable were taken out by the administrator's father and cash paid therefor. The bank at all times appears to have had ability to borrow reasonable sums upon the hypothecation of good bills receivable.

The evidence tends to show that a large amount of the bank's bills receivable were of little or no value. An examination of the bank's affairs was had on or about April 25, 1931, under the direction of the state superintendent of banking. This report is illuminating. It shows that in excess of $91,000 of the bank's bills payable were classified as objectionable. Appellant testified that he at all times believed the bank to be solvent and that he at no time believed that the funds in his hands as administrator were in danger of being lost. It is probable that, if an order of distribution had been made by the court and promptly acted upon in August, 1931, sufficient money might have been borrowed by the bank to have enabled appellant to make proper distribution to the parties entitled thereto, but, as stated, there were few days during the year on which the sum could, with safety to the bank, have been withdrawn and distribution made. The bank held security for many of

the obligations due it. Some of the security was represented by second mortgages, and much of it was of doubtful value.

It is a matter of common knowledge that, during the latter portion of the period covered by the transactions referred to, there was a more or less rapid decline in prices and values. This was, of course, well known to appellant. The testimony introduced in his behalf as to the value of the security held by the bank and of property owned by its debtors is, when considered in connection with the fact that sales could not be made, much exaggerated. Decedent at the time of his death had $6,859.36 on deposit in the savings account of the bank. This sum, with accumulations, stood to the credit of appellant when the bank closed. The balance of the funds were kept as a general deposit.

A few days prior to September 11th, Tillie Evenson, the holder of a time certificate for $8,165.10, according to her testimony, demanded payment in currency. Appellant denied that she demanded currency. In any event, payment in currency was not made, and she was given a cashier's check instead which, because of the closing of the bank, was not paid. On the date the cashier's check was issued, the balance cash available held by the bank was $12,319.23. As stated, this item fell on the 11th of September to practically $8,000. It was then that a meeting of the board of directors was called and the conclusion reached to liquidate the bank. The trial court made a finding of facts which, because of the clearly stated reasons of the court for the conclusion reached, we quote as follows:

"Hanson was the only active officer in charge of the bank * * * and had sole charge of the bank. * * *

"At the time he was appointed * * * there was a large amount in the bank in savings accounts. It is the duty of the administrator to reduce such assets as notes, savings accounts and time certificates to cash, * * * to collect all moneys due the estate. On direct examination he said the bank had a rule that savings accounts could not be withdrawn without * * * thirty or sixty days' notice. On the stand the last time, he said he could draw the money at any time; he did not say the rule had been suspended, or that he had the consent of the directors or officers to withdraw the money. He continued the investment. * * * He said * * * he could not find the pass-book * * * because he did not have access to the bank in the daytime, and * * * said he was there one day last week and did not look for the pass-book. * * * He has not proven that he

could withdraw the money. * * * If the administrator invests the money, or fails to collect when he can collect, and the money is lost, he is liable. * * *

"If (the bank) was in straitened circumstances, or there was danger of losing the money * * * (of) the estate, then the administrator was negligent in not withdrawing the money and putting it in a safe place. * * * There were many safe places in which money could have been placed * * * in the bank's safe * * * in a safety deposit box in a large bank.

"That the bank was insolvent on September 11 (1931) has been proven by a clear preponderance of the evidence. It also appears to the court that Mr. Hanson knew the bank was insolvent. It was not only insolvent in the sense that * * * it could not meet its obligations in the orderly conduct of its business; but * * * as shown by the evidence, its assets were insufficient to pay * * * the depositors. * * * It appears from the books kept by the bank that it was in a precarious condition for some months prior to September 11, 1931 * * * that the bills receivable had shrunk * * * from $240,000 to $216,000. I assume of course that this $24,000 had been collected and converted into cash. But * * * the cash had shrunk * * * $8,000 notwithstanding that it had been augmented by collections from bills receivable by $24,000. The individual deposits had shrunk from $122,000 to $93,000. The time deposits * * * had shrunk from $67,000 to $50,000; and the savings accounts from $34,000 to $25,000. The bills payable, on the other hand, during the same time, had increased from $16,500 to $36,000. This * * * certainly shows that the bank was in a precarious condition during the summer of 1931. The cashier and managing officer must have known this. * * * He made no effort to remove the money * * * to a safe place. He had ample opportunity to do so. * * * His cash was constantly going down; he borrowed money from other banks to keep up his cash reserve; and this money belonging to the estate was used in maintaining the operation of the bank from March 11 until September 11. * * * Knowing, as he must have known, that his bank was not a safe receptacle for the money, it was his duty to remove it from the bank. The court finds that in failing to do so, he was negligent, and was not faithful to his trust as administrator. Much has been said about the examiner's report rendered in April, 1931. It is hard to read this report * * * without considering it as an alarm sent out by

the Banking Department. One-third of the bills receivable were listed as objectionable. * * * It is entitled to very slight weight as evidence of the solvency of the bank, because it was made up * * * from assurances given the examiner by the cashier himself.

"When Mr. Hanson called the directors together * * * he knew that the Evenson cashier's check would soon come in, and that he did not have enough money on hand to pay it. He knew the heirs were clamoring for settlement * * * and distribution, and that the time was at hand to make distribution. He knew that approximately $15,000 would have to be raised to make this payment. * * * From the evidence, I feel certain that Mr. Hanson was cognizant of the fact that the bank, for many months before it closed, was an unsafe place to keep trust funds."

Further, the testimony on behalf of appellees tended to show that on repeated occasions demand was made of the administrator for a partial distribution of the assets of the estate. This was, however, denied by appellant. The debts of the estate, if any, were paid, and all personal property had been converted into cash. A sufficient amount of Liberty bonds remained under the control of appellant, apparently at least, to have met any unascertained demands of creditors.

Appellant must have been conscious of his inability, with safety to the bank, to have withdrawn the amount due the heirs of Norris Enfield on almost any day during the year. Some of the heirs were, in fact, debtors of the bank. Whether an adjustment could have been had with them upon the basis of an offset we do not know. Some claim is made by appellant that, under the arrangement made with the heirs by which he agreed to serve the estate as administrator for $50, they, tacitly at least, agreed that he might deposit and retain the funds in the bank. The contention has little of merit notwithstanding the agreement of the administrator to serve practically without compensation. No fraud is charged or claimed by any one in connection with the case.

The court also refused to permit counsel to introduce testimony as to the condition of other banks in the community. The ruling was correct. No doubt the safety of banks generally was threatened during the time in question by the constant withdrawal of funds and the failure of debtors to pay their obligations thereto. This fact must have been well known to appellant. Appellant was at all times, apparently, confronted on the one hand with the safety of

the bank and, on the other with his duty to exercise the degree of care required by law on behalf of the beneficiaries of the trust reposed in him. If his position with respect to these matters was inconsistent, he chose in favor of the bank. The funds of the estate were too valuable to the bank to permit their withdrawal. The designation of the bank by the examiners as an "A" bank has little probative value. No one knew better than appellant its true condition.

Other matters are discussed by counsel but what we have said above disposes of the case. This court cannot say, on the record before us, that the finding and judgment of the trial court is without sufficient support in the evidence. It must be held, therefore, that the default charged against appellant be sustained.—Affirmed.

ALBERT, C. J., and ANDERSON, KINDIG, and KINTZINGER, JJ., concur.