In re Trusteeship of State Bank of Central City.

No. 44648.

October 15, 1940.

Rehearing Denied January 24, 1941.

Geo. C. Claassen, for appellants.

Deacon, Sargent & Spangler and Carl F. Jordan, for appellees.

HAMILTON, J.—The trouble in this case arises out of the management of the trusteed assets of a failed banking corporation. The story is not unlike many others which were written into the history of Iowa communities throughout the state in the late twenties and early thirties of the present century prior to the enactment of the Federal Deposit Insurance Act. For many years prior to 1920, the little town of Central City, Iowa, had 2 banks, The Central City Savings Bank and the State Bank of Central City, and was a thriving, prosperous farming community. That community, like all others in Iowa, experienced the inflation of prices and the accompanying expansion of credit following the World War. Sanity was finally restored, the boom ended, but the damage had been wrought. The story is familiar to all of us. Then came a period of recession of farm prices and consequent shrinkage of bank assets. The Central City Savings Bank went under in 1925. The State Bank of Central City likewise closed its doors and was placed in receivership in 1926. Enterprising citizens, ever hopeful, working in conjunction with the state superintendent of banking, sought some method of again having a banking institution. They went through the grueling experience of obtaining waiver agreements from depositors necessary to meet the requirements of the new banking laws and the state banking department. The result of these efforts was the organization of a new bank, the Wapsie Valley State Bank, which was organized in the spring of 1927.

The new organization assumed 60 percent of the deposit liability of the State Bank of Central City and took over what was desirable of its assets. The remaining 40 percent of deposits and the undesirable assets were turned over to three trustees; depositors in the old bank became depositors in the new bank to the extent of 60 percent of the deposit liability and were given new certificates of deposit on the new bank, payable in 1, 2, and 3 years. The other 40 percent of the deposit liability was evidenced by trustees' certificates. Three reputable citizens, who had been active in the reorganization movement, were selected as trustees and were appointed by decree of court in the receiver-

ship matter. They were F. G. O'Meara, a general merchant, L. S. Hamilton, an automobile dealer and realtor, and D. F. Barrow, a retired farmer. These same men were also selected as directors and managing officers of the new bank, O'Meara as president and Hamilton as vice-president. The new bank having been fully organized, the receivership was closed, jurisdiction being retained for making necessary orders in the trusteeship matter. This, of course, was all accomplished through the co-operation and with the approval of the state banking department and the receiver of the defunct bank by and with the sanction of the district court of Linn county.

The mechanics by which this reorganization was accomplished is familiar to most of the legal profession in Iowa. A written agreement was entered into between the trustees and the state superintendent of banking, as receiver, which agreement was approved by the court and which fixed the powers, duties and responsibilities of the trustees relative to the trusteed assets and contained, among others, the following provisions:

"5. The said Trustees shall be vested with full power and authority to do every act necessary and advantageous to the liquidation of the trust estate and the distribution thereof.

"6. The said Trustees shall have full power of possession and control of every item of property included in the trust estate until finally collected, liquidated or otherwise disposed of in accordance with the true spirit and purpose of the trust.

"7. The said Trustees shall have full power and authority of settlement and adjustment and sale and their determination shall be conclusive on all parties to this agreement.

"8. The said Trustees shall have full power and authority to renew bills receivable and commercial paper and to extend the time of payment thereof as to said Trustees may seem right and proper and may substitute securities and take additional securities for any indebtedness due the trust estate.

"9. The said Trustees shall have full power and authority to bring actions at law or suits in equity to enforce any indebtedness due the trust estate and to foreclose or otherwise enforce any pledges, liens, or other securities given to secure any such indebtedness.

"10. The Trustees shall have full power and authority to incur expenses including legal expenses, court costs, cost of necessary help and other valid and legitimate expenses in connection with the liquidation of the trust estate. The determination of necessity thereof and the amount thereof shall be within the discretion of the Trustees.

"11. The Trustees shall receive such compensation as shall be allowed by the District Court of Linn County, Iowa, and for the purpose thereof, the District Court of Linn County, Iowa, retains jurisdiction.

"12. The beneficial interest of the holders of each and every Trustees' certificate and the trust estate shall be, for the period of time ending on the 27th day of March, A. D. 1929, subject to the following express rights and beneficial interests of the Wapsie Valley State Bank of Central City, Iowa, to-wit:

" * * * During the period of time referred to, to-wit, the period of time ending on the 27th day of March, A. D. 1929, the said Wapsie Valley State Bank of Central City, Iowa, shall have the right to exchange any or all of the assets and property so taken over (except banking house, furniture, fixtures and equipment) by the said Wapsie Valley State Bank in conformity to said order and decree for cash or property in the trust estate dollar for dollar plus accrued interest.. * * * Such right of exchange shall extend to re-exchange of paper or assets with the same rights and subject to the same conditions. Said right to exchange paper shall apply to renewals and extentions of any indebtedness, either on the part of the Wapsie Valley State Bank as to assets and paper in its hands or to the Trustees as to any assets or any paper in their hands.

"13. The Trustees shall not, without the express approval in writing of the Wapsie Valley State Bank of Central City, Iowa, declare or pay any dividends from the trust estate to holders of the Trustees' certificates, prior to the 28th day of March, A. D. 1929, at which time and date the beneficial interest and right to exchange of the Wapsie Valley State Bank of Central City, Iowa, shall cease, terminate and be at an end.

"14. The Trust estate shall be liquidated and distributed

within six months after the 28th day of March, A. D. 1929, unless such period of time be extended by an order of the District Court of Linn County, Iowa. From and after the 28th day of March, A. D. 1929, the Trustees may with the approval of the District Court of Linn County, Iowa, sell all assets and property in the trust estate not liquidated at public auction. * * *

"15. The Trustees shall have full power and authority to execute and deliver deeds of conveyance of real property and any other instruments of conveyance necessary to convey any of the property of the trust estate. The Trustees shall have full power and authority to pay taxes which may be levied upon the trust estate or any part thereof and to charge the same to the estate.

"16. Every beneficial interest in the trust estate of the holders of the Trustees' certificates and the Wapsie Valley State Bank of Central City, Iowa, shall be subject to the payment of the expenses and compensation authorized to be incurred as herein provided and taxes which the Trustees may deem proper to pay from the trust estate.

"17. From and after the 28th day of March, A. D. 1929, the Trustees shall have full power and authority to declare dividends in such amounts as they may determine and to pay the same proportionately according to the beneficial interests of the holders of the Trustees' certificates, and said Trustees shall, upon the final liquidation of the trust estate and within ten days thereafter, make a final dividend and report to the District Court of Linn County, Iowa, their acts in the premises.

"18. The District Court of Linn County, Iowa, retains jurisdiction of said trust estate for the purpose of making orders and decrees relative thereto as from time to time may be right, proper and necessary to secure and preserve the trust estate for the use and benefit of the parties entitled thereto as otherwise provided in the order and decree referred to herein and this agreement."

Pursuant to said agreement, the trustees took over said trusteed assets consisting of about 150 separate items. Trustees' certificates were issued for the aggregate sum of $142,497.77, representing the amount of all unpaid claims established against

200

said receiver in the· receivership matter. According to the agreement, during the 2 years ending·March 27, 1929, the trustees were not permitted to pay any dividends on the trust certificates; during said period, the trustees could do little else than make collections and the record shows that they made collections amounting to approximately $50,000, practically all of which the new bank took over under its right·to recourse assets during said 2-year period. It will be noticed from the agreement that it was contemplated, at the·time it was entered into, that the trustees would be able to liquidate said trust estate and close the same within 6 months from and after the ending of the 2-year period which ended March 27, 1929. This was that period in our nation's history during which the expression "Prosperity is just around the corner" was so prevalent and said prosperity was hopefully looked forward to by all of us. No one could foresee that the depression was going to continue and grow steadily worse, but it is a matter of common knowledge now that conditions grew ever more depressing until collections became practically impossible. The new bank, like many others organized under similar circumstances during this period, was, in March 1933, forced to take refuge under·what is known as Senate File 111, freezing its assets including about $11,000 of the funds of the trust estate on deposit in a checking account at the time. It will be noticed that there is a permissive provision in the contract authorizing sale at public auction of trusteed assets which, had the same been taken advantage of, would have enabled the trustees to close the trusteeship. From the standpoint of good business management, to have taken such course would have been unwise and would, without doubt, have resulted in great loss to the trust estate. At the end of the 6 months period, which would have been about the first of October 1929, the work of the trustees in the administration of the trust was far from fulfilled. In fact, they were, at the time, in litigation with Mr. Henderson, the primary objector herein, over the collection of indebtedness which he owed the trust estate and which did not terminate. until the year 1931. There was also a vast·amount of uncollected assets yet to be administered upon.

In administering the trust, it was found advantageous in

making settlements with debtors to buy up outstanding trust certificates for less than their face and use them in part payment in liquidating their indebtedness, and this demand for trust certificates and their feasibility in the hands of debtors in aiding the liquidating of their debts led to a considerable amount of what the appellant refers to as "trafficking" in these trustees' certificates. Three young men employees of the new bank established a small pool or fund, depositing the same in the bank under the name "Trustees' certificate fund" and most all of this so-called "trafficking" was carried on by them. Something over $60,000 worth of trustees' certificates in all were used in this manner in settling with debtors of the trust estate. When the trust certificates were turned in, they were canceled, thus reducing the trust liabilities. Numerous other kinds of trading and exchanging of property, from threshing machines to chicken coops, were carried on by the trustees, it being necessary, because of the scarcity of cash, to use any and every means available of ultimately turning the trusteed assets into money.

None of the trustees were expert bookkeepers. In fact, when they first took over the trust, they pigeonholed each item by having a separate envelope, and all transactions relating to each specific item were carried on loose leaves or memorandums in these separate envelopes. They finally, after about 4 years of this sort of bookkeeping, opened a set of books, transposing from the memorandums in each envelope all facts and figures to separate pages in the book. In doing this, they had the aid of one more experienced in making up a set of books. After this transposition, the original material containing the original entries carried in the envelopes seems to have been destroyed and was not available, at least not all of it, at the time of the trial. The trustees were likewise very derelict in making reports to the court. In fact, they made no report of their doings until May 1932. They were also derelict in not obtaining an order of court authorizing continuance of the trusteeship. In this first report they did call attention to the financial condition and the resultant slow process toward liquidation of the assets and stated:

" * * * that if this Trusteeship is allowed to stay open and

your Trustees allowed to continue in their efforts to make the collection of uncollected notes and to dispose of real estate taken as hereinbefore stated, that such a procedure would be better than to sell all of said notes and to sell said real estate on the present market, and for these reasons your Trustees believe it to be for the best interests of this Trusteeship that they be allowed to continue and that this Trusteeship remain open for an additional period of time. * * *

"Wherefore, your Trustees pray that the foregoing Report be approved and that proper Orders be made allowing and authorizing the Trustees to continue further as such Trustees, * * * "

This report was approved by the court; however, there was no formal order made concerning the continuance of the trusteeship. No exceptions appear to have been taken at the time to this report and it is not shown that there was anyone demanding, at that time, that the estate be closed. Thereafter, on the 10th day of April, 1934, a second report was filed in which a similar statement in reference to financial conditions and the desirability of continuing the trust was incorporated. However, in October 1934, E. E. Henderson, who stated in his testimony, in substance, that he spent most of the year previous working among the holders of trustees' certificates obtaining assignments from all that he could, filed objection as such assignee to the first and second reports. Pending a hearing on these objections, a third report was filed by the trustees on the 8th day of August, 1936, in which was reincorporated all that was contained in the first and second reports. This third report sets out in detail and in separate schedules the entire transactions of the trustees. Schedule I contains an itemized statement of all matters relating to each of the 137 notes turned over to the trustees; schedule II is an itemized statement concerning the notes recoursed to the trustees by the new bank; schedule III is an itemized statement in reference to each piece of real estate; schedule IV is an itemized statement of the notes which were charged off by the State Bank of Central City, prior to its closing; and so the schedules go on—21 separate schedules in all covering every different and separate kind of transaction of the trustees, the report comprising 75 typewritten pages. To this report objec-

tions were filed by said E. E. Henderson, as assignee, in which exception is taken to each of the 21 schedules. Thereafter, on January 18, 1937, Leo G. Wegman, treasurer of state—the state being a depositor in the defunct bank—joined Henderson in his objections but took no active part in the trial of the case. These objections are entirely too voluminous for us to make any attempt to incorporate them in this opinion. In brief, the objections relate to the failure of the trustees to close the trust at the end of the 6 months period; failure to make reports; failure to obtain orders of court; permitting the trusteed assets to remain on deposit in the new bank and to become frozen by the bank going under Senate File 111; failure to account for all of the assets and interest earned and collected; alleged misconduct in ''trafficking'' in trustees' certificates; excessive attorney's fees and excessive fees and expenses of the trustees.

At the trial, each of the items handled by the trustees and referred to in their report and schedules had to be gone into by the trustees in assuming the burden of explaining and justifying their conduct and in accounting for the funds of the trust estate. The trial continued for 35 days and the case was finally submitted at the close of the March 1937 term. A vast record was made—the printed transcript, abstract of record, briefs and arguments comprising several thousand pages and, in addition, about two bushel baskets full of exhibits. It must be noticed that this trial took place approximately 10 years after the trusteeship was opened. Many persons interested in one way or another and who had had something to do with some of the various transactions were deceased. All such gaps necessarily had to be filled in by circumstantial evidence. It can be readily seen that the trial court had a tremendous task. Both sides were represented by able and astute counsel. One side introducing every scrap of evidence possible in an effort to fasten personal liability on the trustees and the other side having the tremendous task, after the lapse of so many years, to satisfactorily explain each and every item in order to demonstrate their honesty and sincerity and to show that they had accounted for all the funds coming into their hands to the satisfaction of the trial court.

Manifestly, we cannot go into detail in this opinion in discussing each of the 150 items involved; neither do we deem it

necessary or essential to a proper disposition of the case to do so. The able trial court took the case under advisement and considered it from March until September, and in his finding and judgment states:

"In determining whether the acts of the Trustees have been prudent within the meaning of the rule, we must look at the facts as they existed at the time of their occurrence, not aided or enlightened by those which subsequently took place, for it is an obvious truth that a wisdom developed after an event, and having it and its consequences as a source, is a standard by which no man should be judged; and it is impossible to say that Trustees are wanting in sound discretion simply because their judgment turned out wrong.

"Trustees, acting honestly, with ordinary prudence and within the limits of their trust, are not liable for mere errors of judgment; trustees should not be held liable for unfortunate results which they could not be expected to foresee and were powerless to prevent.

"The Court does not find that there was any clear and satisfactory evidence of dishonesty by the Trustees; many questions have been raised about certain of their acts, but the Court is not satisfied in his own mind that any of the acts were dishonest.

"The Court finds, however, that there were very many errors of judgment, but takes judicial notice of the unfortunate times through which we have passed since this receivership was instituted.

"The Court finds that the Trustees have been negligent in not making proper applications to and getting the approval of a Court for many of their transactions; also that they have been derelict of their duties in not making progressive reports—only three reports having been made in something like eight years; and in much delay in making their accountings and distributions.

"The objectors were warranted in taking steps against the approval of this, the third report, as instanced by the Trustees, after the case had proceeded for quite a long time, filing an amendment conceding that interest in the amount of One Thousand Eight Hundred Fifty-eight Dollars and Sixty-four cents ($1,858.64) had not been accounted for.

"The Court finds that the Trustees are individually liable for the amount shown by said third report to be on deposit in the Wapsie Valley State Bank, which bank is in the hands of the Superintendent of Banking of the State of Iowa as Receiver, the Trustees having been directors and officers of the said Wapsie Valley State Bank at the time it went into the hands of said Receiver, and the Court directs that said Trustees pay into the trust fund said amount with interest thereon to September 1st, 1937, which amount with interest so computed by the Court is determined to be Seven Thousand Three Hundred Twenty-three Dollars and Seventy-two cents ($7,323.72) and upon payment of said amount by said Trustees or the surety on their bond, the said Trustees or the surety on their bond, which ever makes such payment, shall be subrogated to all rights against the Receiver of said Bank to said deposit and shall be entitled to receive such dividends as shall hereafter be paid by said Receiver of the said Wapsie Valley State Bank.

"All other objections to the said third report of said Trustees are overruled and a finding is hereby made in favor of the Trustees thereon, it being the intention that this finding and judgment shall be a final adjudication and determination of all issues raised by the third report of the Trustees and the amendment thereto and all objections filed thereto.

"The Court therefore finds that the said third progressive report should be approved with the exception that the said Trustees are held liable to account personally to said trust for the said sum of Seven Thousand Three Hundred Twenty-three Dollars and Seventy-two cents ($7,323.72) on account of said balance of said deposit in the Wapsie Valley State Bank as herein set forth and judgment is entered accordingly, the amount of said judgment with interest thereon from September 1st, 1937, to be accounted for by said Trustees hereafter in lieu of said sum of $5,904.04 shown by said third progressive report to be in the hands of the Receiver of said Wapsie Valley State Bank."

This is an action triable in equity and, hence, should be decided in accordance with equitable principles. We have examined and considered this vast record, have read and weighed the arguments of opposing counsel in which each

item is separately discussed and considered, and, after doing so, we have come to the conclusion that the trial court has reached the right result, that his decision is as just, fair and equitable as is possible to be rendered under all the facts and circumstances. as disclosed by the record, and, hence, should have our approval. While the record discloses an inadequate system of bookkeeping and there are some discrepancies and seeming inconsistencies in the testimony of the trustees relative to some of the items, from which objectors have drawn inferences of misconduct, not wholly without justification, yet, with the aid of a public accountant who audited the trustees' books and records and gave testimony concerning the same to the effect that their accounts were correct and from the explanations given by the trustees in their testimony and the exhibits introduced in evidence, which are before us, we think it can be fairly said that the trustees have shown to the satisfaction of the court the accuracy of their accounts as set forth in their third report and amendments thereto in the several schedules attached to said report. While the methods used in the keeping of their accounts leave much to be desired, especially when the accounts cover such a long period of time, yet, on the whole record, we think the trial court was justified in finding that there was no intentional fraud; that the trustees were at all times actuated by honest motives; that there is no satisfactory showing that they profited in any personal manner in any of the transactions; that, aside from one item, being the money on deposit in the bank, the record falls short of any substantial or satisfactory showing that the trust has suffered any loss or harm because of any of the alleged charges of misconduct or because of the irregularities charged against them.

When we take into consideration the fact that the trusteed assets contained all the assets charged off as worthless and all the least desirable assets remaining after the new bank had selected the best assets, and the further fact that the new bank, exercising its right of recourse, appropriated unto itself the first $50,000 collected, and transferred to the trustees in lieu thereof other undesirable paper to be collected by the trustees, and that, in spite of the unfavorable conditions, the record

shows the trustees had collected and distributed to the holders of trustees' certificates dividends amounting to 45 percent, we are surely forced to the conclusion that the trustees did a rather remarkably good job in carrying out the purpose of the trust; and this seemingly good result achieved for the beneficiaries should, in all good conscience, at least in a measure, compensate for the inadequate manner in which the records of some of the transactions were kept and the irregularities in some of the methods used. In considering the acts and conduct of the trustees, the rather broad powers vested in them by the contract must be taken into consideration. It is apparent from a reading of these provisions set out above that few, if any, limitations as to methods used were intended to be placed on the trustees. There is a plainly expressed intent not to hamper the trustees as to the methods to be used in turning the assets, ultimately, into cash. As to the failure of the trustees to close the trust at the end of the 6 months period, the court is satisfied that to have done so would have resulted in great loss to the beneficiaries and, while the word "shall" is used in this connection in the agreement, it cannot be said that the language so used has the effect of terminating the trust. It should be kept in mind that this is an active trust growing out of the liquidation of a bank and was still under the supervision of the court which created it. There isn't any doubt about the proposition that the trustees should have fortified themselves by a court order for the continuance of the trust, but their failure to do so should not result in fastening personal liability on the trustees unless there is proof that the continuance beyond the period mentioned in the agreement resulted in loss to the beneficiaries. Under this record, there is no such showing; the showing is to the contrary.

The objectors contend that the trial court was wrong in not computing interest on certain funds that the trustees received but which were not included in their first report, contending that the trustees were making use of the funds unlawfully and for their own benefit and, hence, should be charged with interest. They rely upon the rule announced by this court in Loetscher v. Dillon, 119 Iowa 202, 93 N. W. 98, and similar cases to the effect that where a trustee has converted money or

property, he must account for the amount of money received, with legal interest thereon while it is in his possession. The rule has no applicability to the facts as found by the trial court and as this court has found, there being no sufficient showing of any mingling of the funds of the trust with their own personal funds or that they converted the same to their own use or used them in such a way as to result in profit to themselves.

Hence, we conclude, on the whole record, that the appeal of the objectors is without substantial merit.

 Should the trustees be held personally liable for the money on deposit in the Wapsie Valley State Bank at the time it went under Senate File 111? The trial court answered this question in the affirmative and, from this ruling, the trustees have appealed. They cite and rely upon the principle of law well established in this state that trustees are permitted, without authority of the court, to deposit in banks for safekeeping funds of the trust estate and are not personally liable for losses arising therefrom unless there was negligence or fraud in selecting the bank. Andrew v. Sac County State Bank, 205 Iowa 1248, 1256, 218 N. W. 24, 27; Officer v. Officer, 120 Iowa 389, 94 N. W. 947, 98 Ann. St. Rep. 365. The degree of care in selecting the bank is that degree of care which prudent men use in the direction of their own affairs. Trustees may be held responsible for loss of funds because of the failure of a bank in which they have deposited funds of the trust estate when the unsafe condition of the bank was known to the trustees or might have been known by the exercise of ordinary prudence and diligence. The question is, in all such cases: Were the trustees reasonably prudent and diligent in making or continuing the deposit? In re Estate of Workman, 196 Iowa 1108, 196 N. W. 35; Incorporated Town of Conway v. Conway, 190 Iowa 563, 180 N. W. 677.

In the instant case, the trustees were directors and two of them were officers of the bank in which the funds were deposited. Hamilton personally transacted most of the business in connection with the management of the trusteeship and for this purpose maintained quarters in the bank building. As such officers and directors, they had control and general management of this bank. It was they who invited the state banking department to place their bank under Senate File 111. They

must, therefore, be charged, as a matter of law, with knowledge of the bank's financial condition. They occupied a dual capacity, their duty on the one hand toward the banking institution, and their duties as trustees on behalf of the beneficiaries of the trust estate. To withdraw $11,000 from the bank funds under their control and for the loss of which they might become personally liable would be in the nature of a personal preferential act and would have, no doubt, resulted in throwing the bank into immediate receivership. To leave the funds on deposit involved a hazard which might result in loss to the trusteeship, it being problematical, under such conditions, whether the bank could weather the storm and retain its solvency and again reopen as a going concern. In choosing the latter, they must be held to have personally assumed the risk and be held personally liable for the loss which resulted. This seems to be the rule announced in In re Estate of Enfield, 217 Iowa 273, 251 N. W. 637; In re Estate of Foster, 218 Iowa 1202, 256 N. W. 744; and in In re Estate of Rorick, 218 Iowa 107, 253 N. W. 916.

While the situation, in this case, is not parallel in all respects with the cases cited, the principle of law is equally applicable. The distinction lies in the fact that the evidence in the instant case does not show that the bank was insolvent when it was placed under Senate File 111; however, the conditions were such that these officers determined that it was necessary to freeze the assets by taking shelter under this law which was enacted for the very purpose of preventing a run upon banks by the depositors. There is no evidence that there had been any cessation of payment of deposits or that there was any demand made for or refusal to pay any deposit; however, the court will take judicial notice of the fact that it was at the time generally known that banks throughout the state and nation at this critical period were desperately fighting to keep their institutions open. So desperate was the situation that the president of the United States declared a banking holiday closing all banks, and the state legislature passed Senate File 111 to meet the emergency. There was then the element of uncertainty as to the safety of this bank as a depository of these trust funds which we think brings the case within the rule announced in the cases last above cited.

210

We therefore hold that, on the appeal of the trustees, the case should, likewise, be affirmed.—Affirmed on both appeals.

MILLER, MITCHELL, OLIVER, BLISS, and SAGER, JJ., concur.

STIGER, J., would reverse on appeal of trustees.