Hart, J.
 

 For convenience, in the course of this opinion, the Superintendent of Banks in charge of liquidation of The Guardian Trust Company will be designated as the superintendent and The Guardian Trust Company as the bank.
 

 The Probate Court, in sustaining the exceptions to the accounts of the trustee and of the superintendent, assumed to find not only that the investments in question were unauthorized and void and that the trustee bank should be surcharged with the amount invested in the land trust certificates, but went further and ordered the -superintendent to issue to the successor trustee a certificate of claim showing the allowance of an unpreferred claim for the amount so invested, secured by a lien upon the land trust certificates -so purchased by the bank for the repayment of the original sum invested until it was -paid in full.
 

 The Common Pleas Court held that the Probate
 
 *32
 
 Court had jurisdiction to hear the exceptions to the accounts of the trustee and superintendent, to settle the accounts, to surcharge the former trustee with a certain amount of the funds originally placed in its hands and to direct the superintendent to issue a certificate of claim for such amount against the assets of the bank, but that the Probate Court did not have power or jurisdiction to render a money judgment against the bank or the superintendent. The Court of Appeals took the same view of this matter, and this court approves that holding.
 
 Squire, Supt. of Banks,
 
 v.
 
 Bates,
 
 132 Ohio St., 161, 5 N. E. (2d), 690.
 

 The Probate Court, under the statutes, had jurisdiction merely to settle the accounts of the trustee and to make its finding as to the claim against the bank, but the matter of preferences, liens, liquidation of assets, and the settlement with the successor trustee is, under the law, under the control of the Superintendent of Banks through the direction and order of the Common Pleas Court in the liquidation proceedings.
 

 The ground of the exceptions filed in the Probate Court was that the investments made by the trustee in land trust certificates were unauthorized, because there was self-dealing on the part of the trustee in the acquisition of such certificates which constituted disloyalty to the trust, and the exceptions were sustained on that basis.
 

 Before discussing the facts surrounding the several transactions through which the trust certificates in question were acquired by the trustee, certain legal principles relating to the rights and duties of trustees generally with reference to their trusts may be stated, so that these principles may be kept in mind and applied to the conduct of the trustee in each particular case in its dealing with the investments which it selected and procured for the trust in question.
 

 There is no legal inhibition against a corporation or an individual authorized to act in a trust capacity,
 
 *33
 
 from becoming a trustee of multiple trusts, or, according to the weight of authority, from transferring securities from one of its trusts to another by purchase and sale, provided the trustee does not have a beneficial interest in the securities so transferred, and provided the terms of the sale and purchase are fair and made in good faith as between the several trusts.
 
 French, Trustee,
 
 v.
 
 Hall,
 
 198 Mass., 147, 84 N. E., 438;
 
 Springfield Safe Deposit & Trust Co.,
 
 Trustee, v.
 
 First Unitarian Soc.,
 
 293 Mass., 480, 200 N. E., 541;
 
 Barker
 
 v.
 
 First Natl. Bank of Birmingham,
 
 20 F. Supp., 185;
 
 U. S. Natl. Bank & Trust Co. of Kenosha
 
 v.
 
 Sullivan,
 
 69 F. (2d), 412; Restatement of Law of Trusts, 431, Section 170
 
 “q”;
 
 2 Scott on Trusts, 886, Section 170.16. But this rule has been severely criticised and its validity is not free from doubt. It is not sanctioned by the well-established rule of agency which forbids an agent to represent and act for both parties to a transaction, except with the knowledge and consent of both.
 
 City of Findlay
 
 v.
 
 PertZ
 
 (6 C. C. A.), 66 F., 427, 29 L. R. A., 188; 1 Ohio Jurisprudence, 763, Section 85; 2 American Jurisprudence, 211. And it is significant that the Uniform Trusts Act, Section 6, which, however, has not yet been adopted in Ohio, provides that “no trustee shall, as trustee of one trust sell property to itself as trustee of another trust.” However, other sections of the act permit trust-to-trust transactions if they are specifically authorized by the instrument creating the trust, or if the written consent of the beneficiary having legal capacity be obtained, or if a court of competent jurisdiction with notice to the beneficiaries gives approval.
 

 Such transactions, however, call for the utmost good faith, and when questioned, the courts will scrutinize them with care because they present an opportunity to the trustee to clear himself in settlement with one trust by transferring questionable securities held therein to another trust wherein the obligation of settlement is
 
 *34
 
 deferred.
 
 First Natl. Bank of Birmingham
 
 v.
 
 Basham
 
 (Alabama), 191 So., 873, 876.
 

 Again, there is no legal inhibition against the action of a trustee in setting up a special or independent trust in property other than his own and in becoming the trustee for the securities issued thereunder, even though done for the sole purpose of selling such securities as an investment to other trusts for which he may also be trustee, provided the transaction is free from self-dealing, free from profit-talcing on his own account, and provided such transaction is fair and made in good faith as between the several trusts. Since, in such case, the trustee has or should have no beneficial ownership in the securities held in the several trusts, it is assumed that there is no temptation to engage in self-dealing or profit-taking as between the trusts, and the law will assume that such transactions are
 
 prima facie
 
 fair and honest. The trustee, in serving his clients in a trust capacity, has ever before him the problem and responsibility of promptly securing sound investments yielding adequate and regular returns, and such responsibility carries with it large discretion in these matters.
 

 On the other hand, the handling of multiple trusts, of necessity, calls for a high degree of care and a sense of extreme loyalty upon the part of a trustee as to each of his various trusts. It must be evident that this obligation is made more difficult as the size and number of the trusts for which he is trustee increase. The record in this case shows that The Guardian Trust Company, in the years immediately prior to its liquidation, was trustee for trusts, the investments in which ranged in the aggregate from $150,000,000 to $230,-000,000, and from the briefs it appears that the investment requirements to service these trusts aggregated from $10,000,000 to $20,000,000 per year. In oral argument it was stated that at least one trust company in Cleveland is truátee for more than 5,000
 
 *35
 
 separate trusts. Under such, circumstances, undivided loyalty to each trust is obviously almost an insuperable task, since there must exist a temptation and the urge of special circumstances to favor one trust over another in times when changing markets and other considerations make some securities desirable and others already in hand undesirable. Nothing but extreme diligence and fair dealing will, under the law, exonerate a trustee placed in such circumstances. Trust companies perform a great service in the business world and the law must not make the rules of conduct governing them so onerous that they may not function, but it must demand that high sense of honor and measure of integrity which loyalty requires in carrying out the great responsibilities which trust companies voluntarily assume in representing others in a trust capacity.
 

 In the process of providing securities for a trust, a trustee may advance money to purchase securities for his trusts before all the money is available in the trust estate for that purpose. The banking department of a trust bank may lawfully make such necessary advances, make a reasonable charge for the money advanced and repay to itself the money so advanced as soon as it is available in the trusts to which the securities or property is allocated and transferred. Such loans should, however, be made only as a matter of necessity, should be temporary in character and the property or securities should be allocated to the trusts as soon as they are purchased or come into being for that purpose. The trustee may not purchase such property or securities in his own right, or acquire a beneficial interest therein before turning them over or allocating them to a trust for which he is trustee.
 
 First Natl. Bank of Birmingham
 
 v.
 
 Basham, supra.
 

 On this subject, 2 Scott on Trusts, 882, Section 170.14, says:
 

 “No question of self-dealing arises if the trustee never has any individual interest in the property.
 
 *36
 
 Where, however, the trustee advances its own money and takes a mortgage or group of mortgages as security for the loan and subsequently transfers participating shares to the trusts administered by it, the question is whether this is not in effect a sale of its individual property to itself as trustee, with the result that if the mortgages fall in value the trustee becomes personally liable for the loss. It would seem, however, that if the investment is otherwise proper, the mere fact that the trustee advanced its own money in the first place but acquired the mortgages for the purpose of distributing them among the trust estates administered by it and where only a short interval elapses between the purchase and the distribution, there is not such self-dealing as to make the transaction improper. The trustee would rarely be able as a practical matter to advance the money in the first place wholly out of the trust funds of the various trusts, and the advance of its own funds is made not for the purpose of investing its own funds but for the purpose of obtaining an investment for the various trust estates.”
 

 When, in the purchase of property or securities by a trustee for his trust, it becomes necessary to pay off prior liens or incumbrances on the property which is the security for such investments, he may liquidate such liens even though they be owing to himself, provided the property is not taken and the liens paid for the purpose or with the result of liquidating a poor investment of his- own. In such cases strict honesty and fair dealing are required.
 
 Drueding
 
 v.
 
 Tradesmens Natl. Bank & Trust Co.,
 
 319 Pa., 144, 179 A., 229;
 
 Conover
 
 v.
 
 Guarantee Trust Co.,
 
 88
 
 N. J.
 
 Eq., 450, 102 A., 844.
 

 When investments are purchased by a trustee for the benefit of his trust, it is not only necessary that such purchases be made for the trust, but, in order to avoid a charge- of self-dealing, that immediate transfer and
 
 *37
 
 allocation of the securities to the trust for which they were purchased "be made, accompanied by clear evidence that they have been so purchased and allocated. The record of the trustee should clearly ear-mark the securities so as to negative any possibility of the charge of self-dealing. The appropriate method of creating such a record is by written resolution of the trustee board providing for such purchase and allocation to the several trusts, but other record evidence doubtless is sufficient if it is actually made in due course of business and clearly discloses the nature of the transactions.
 
 Chancellor
 
 v.
 
 Chancellor, 177
 
 Ala., 44, 58 So., 423, 45 L. R. A. (N. S.), 1;
 
 Cornet
 
 v.
 
 Cornet,
 
 269 Mo., 298, 190 S. W., 333;
 
 Chapter House Circle
 
 v.
 
 Hartford Natl. Bank & Trust Co.,
 
 121 Conn., 558, 186 A., 543, 106 A. L. R., 260;
 
 Yost’s Estate,
 
 316 Pa., 463, 175 A., 383;
 
 Guthrie’s Estate,
 
 320 Pa., 530, 182 A., 248, 103 A. L. R., 1186;
 
 Fenelli’s Estate,
 
 323 Pa., 49, 185 A., 758;
 
 contra, Springfield Safe Deposit & Trust Co.
 
 v.
 
 First Unitarian Soc.,
 
 293 Mass., 480, 200 N. E., 541.
 

 A recent and leading case on this subject is that of
 
 First Natl. Bank of Birmingham
 
 v.
 
 Basham, supra,
 
 wherein the court holds that “A trustee, who takes and holds title to trust properties in his own name, without a declaration of trust, or other clear evidence that * * * [the properties are] held in his trust capacity for the exclusive use of the beneficial owner, is chargeable, in equity, with a breach of trust. Such a transaction is a commingling of trust properties with his own; clothing himself with indicia of title which he will not be permitted to gainsay when losses come.”
 

 The law is jealous to see that a trustee shall not engage in double dealing to his own advantage and profit. The reason is not difficult to discover when it is remembered that a trusteeship is primarily and of necessity a position of trust and confidence, and that it offers an opportunity, if not a temptation, to disloy
 
 *38
 
 alty and self-aggrandizement. The connotation of the word and name “trustee” carries the idea of a confidential relationship calling for scrupulous integrity and fair dealing.
 
 Ulmer
 
 v.
 
 Fulton, Supt. of Banks,
 
 129 Ohio St., 323, 334, 195 N. E., 557.
 

 The court, in the case of
 
 First Natl. Bank of Birmingham
 
 v.
 
 Basham, supra,
 
 said:
 

 “Basically, self-dealing relates to transactions wherein a trustee, acting for himself and also as trustee, a relation which demands strict fidelity to others, seeks to consummate a deal wherein self-interest is opposed to duty. Typical cases are sales of individual properties to the trust estate, or purchases of trust property for his own benefit. Equity, in such cases, pauses not to inquire, whether the trust estate has sustained a loss. As a matter of public policy, and because of the temptation to wrong-doing, equity arms the
 
 cestui que trust
 
 with an election to affirm or dis-affirm, unless countervailing equities have intervened.
 

 ‘ ‘ This rule applies with full force to- trust companies and banks doing a trust business. Equity would not tolerate, for example, a transfer of a bank’s own depreciated holdings to the. estates administered in its trust department, passing its own probable losses to others toward whom it owes all the obligations of a trustee.”
 

 See, also,
 
 Leathe
 
 v.
 
 Title Guaranty Trust Co.,
 
 18 F. (2d), 41;
 
 Dwight
 
 v.
 
 Hazlett,
 
 111 W. Va., 109, 161 S. E., 434;
 
 Roberts
 
 v.
 
 Michigan Trust Co.,
 
 273 Mich., 91, 262 N. W., 744;
 
 Cox
 
 v.
 
 Camden Safe Deposit & Trust Co.,
 
 124 N. J. Eq., 490, 2 A. (2d), 473;
 
 Harton’s Estate,
 
 331 Pa., 507, 1 A. (2d), 292; and
 
 In re Harper’s Estate,
 
 98 Mont., 356, 40 P. (2d), 51.
 

 On this subject, Section 10506-49, General Code, provides:
 

 “Fiduciaries shall not buy for or sell to themselves nor shall they in their individual capacities have any dealings with the estate, except as expressly
 
 *39
 
 authorized by the instrument creating the trust and then only with the approval of the Probate Court in each instance;
 
 but no corporate fiduciary shall be permitted to do so,
 
 any power in the instrument creating the trust to the contrary notwithstanding. Provided, however, that nothing herein contained shall be construed to prohibit a fiduciary from making an advancement, when such advancement has been expressly authorized by the instrument creating the trust or when the Probate Court shall so approve.” (Italics ours.)
 

 The clause in the above statute, “but no corporate fiduciary shall be permitted to do so,” was inserted by amendment in 1935 (116 Ohm Laws, 385, 392) and, therefore, does not specifically apply to the case at bar, but it is declaratory of the common law and crystalizes in statutory form the age-old rule on this subject, circumscribing within carefully restricted limits the authority and power of a trustee in this regard.
 

 In this connection, Judge Zimmerman of this court, in discussing an analogous question as to whether a bank with trust powers might create a trust out of its own securities and sell participating shares therein, well said in the case of
 
 Ulmer
 
 v.
 
 Fulton, Supt.,
 
 supra: “Such procedure is foreign to the accepted notions of the proper business and functions of a trust company,
 
 vis., the acceptance and execution of trusts at the instance of others,
 
 and we are unwilling- through conjectural and dubious construction to extend to banks exercising trust prerogatives such broad and far-reaching powers as the formation of trusts out of their own property would give them, when the General Assembly has not seen fit to do so through plain and unequivocal language.”
 

 Many banking institutions are organized with several departments such as commercial, savings, trust, bond, loan, real estate, etc. Interdepartmental transactions in such banks cannot be regarded as dealing at arm’s length, as between independent entities. De
 
 *40
 
 partmental banks, after all, are single corporate entities, managed by a single board of directors and owned by shareholders who participate in the combined profits and losses of the several departments. Transactions, therefore, between separate departments, affecting a trust for which the bank is trustee, do not create any immunity against self-dealing as between the bank and the trust, because such transactions, in fact, constitute self-dealing.
 
 Ulmer
 
 v.
 
 Fulton, Supt., supra;
 
 Restatement of Law of Trusts, 431, Section 170, comment
 
 i
 
 and illustration 3;
 
 In re Trusteeship of Riordan,
 
 216 Iowa, 1138, 248 N. W., 21;
 
 Larson
 
 v.
 
 Security Bank & Trust Co.,
 
 178 Minn., 209, 224 N. W., 235;
 
 Marchant
 
 v.
 
 Wannamaker,
 
 176 S. C., 369, 180 S. E., 350.
 

 A trustee qualified to act in that capacity is entitled to reasonable compensation for his- services, chargeable to the trust for which he is trustee. But such compensation should be charged to and paid out of trust funds after the property or securities constituting the
 
 res
 
 of the trust come into the hands of the trustee. Compensation, under such circumstances, is not and should not be hidden or kept in the dark as a matter of no concern except to the trustee. When compensation is charged to and paid out of trust funds, the compensation charge comes, into the accounting, and in the case of court trusts the reasonableness of the charge is subject to the approval and allowance of the court.
 

 Reasonable compensation may be charged by a bank for the organization and creation of a trust the securities of which are later s-old by it to another trust for which it is trustee. In such case, however, the utmost good faith must be observed because the trustee has. no right to load one trust with excessive compensation charges., under whatever name, and later pass them on in the form of so-called cost of securities, when such securities are sold to another trust under its control.
 
 *41
 
 Here lies a temptation to pass excessive compensation or profit charged in one trust to the cost of securities created therein, to another trust where they are hidden and undisclosed to the beneficiaries of such latter trust. Finally, it must be quite clear that a trustee, in creating a trust for the purpose of providing securities to service other trusts under his control, cannot, through commission, schemes of underwriting, or guaranteeing the sale of the securities so created in the parent trust, advance the price of such securities so as to claim profits to himself before they are sold or transferred to other trusts for which he is trustee. Such schemes are clearly self-dealing and profit-taldng on the part of the common trustee and cannot be justified under the law. Restatement of Law of Trusts, 431, Section 170, comment
 
 n; Locke
 
 v.
 
 Cope,
 
 94 Kan., 137, 146 P., 416;
 
 First Natl. Bank of Birmingham
 
 v.
 
 Basham, supra; Ulmer
 
 v.
 
 Fulton, supra;
 
 Section 10506-49, General Code;
 
 Michoud
 
 v.
 
 Girod,
 
 4 How., 503, 11 L. Ed., 1076;
 
 St. Paul Trust Co.
 
 v.
 
 Strong,
 
 85 Minn., 1, 88 N. W., 256;
 
 Smith
 
 v.
 
 Tolversen,
 
 190 Minn., 410, 252 N.
 
 W.,
 
 423;
 
 Meinhard
 
 v.
 
 Salmon,
 
 249 N. Y., 458, 164 N. E., 545, 62 A. L. R., 1;
 
 Cornet
 
 v.
 
 Cornet, supra; Magruder
 
 v.
 
 Drury & Maddox, Trustees,
 
 235 U. S., 106, 59 L. Ed., 151, 35 S. Ct., 77;
 
 White
 
 v.
 
 Sherman,
 
 168 Ill., 589, 48 N. E., 128, 61 Am. St. Rep., 132; 49 Harvard Law Review, 521, at 543; Perry on Trusts and Trustees, 758 (7 Ed.), Section 464; Restatement of Law of Trusts, 438, Section 170;
 
 Clay
 
 v.
 
 Thomas,
 
 178 Ky., 199, 204, 205, 198 S. W., 762, 1 A. L. R., 738; 44 Harvard Law Review, 1282, 1283;
 
 In re Bender’s Estate,
 
 123 N. J. Eq., 171, 196 A., 677, affirming 192 A., 718;
 
 First Natl. Bank of St. Petersburg
 
 v.
 
 Solomon,
 
 63 F. (2d), 900.
 

 The authority of the trustee in the management of his trusts is governed by the statutes of the state, the instrument creating the trust, and the common-law rules governing trusts and trustees. In addition to the statutory provisions already noted, the banking code
 
 *42
 
 of this, state makes provisions for corporate trustees and to some extent defines their powers and duties.
 

 “A trust company may act as agent, and take, accept and execute any and all trusts, duties and powers in regard to the holding, management and disposition of any property or estate, real or personal, which may be committed or transferred to> or vested in said trust estate * * # and may act as trustee under any will or deed or other instrument creating a trust for the care and management of property under the same circumstances and in the same manner, and subject to the same control by the court having jurisdiction of the same as in the case of a legally qualified person.” Section 710-159, General Code.
 

 “In the management of money and property held by it as trustee, such trust company may invest such money and property in a general trust fund of the trust company. But it shall be competent for the authority making the appointment to direct whether such money and property shall be held separately or any part thereof invested in a general trust fund of the trust company. The trust company always shall follow and be entirely governed by the directions contained in any will or instrument under which it acts.” Section 710-164, General Code.
 

 “No property or securities received or held by any trust company in trust shall be mingled with the investments of the capital stock -or other properties belonging to such trust company or be liable for its debts or obligations. Moneys held in the trust department by any trust company, or by any bank having a trust department or doing a trust business, pending distribution or investment, may be treated as a deposit in the trust department or may be deposited in any other department of the bank, subject in other respects to the provisions of law relating to deposit of trust funds by trustees and others *
 
 *
 
 Section 710-165, General Code.
 

 
 *43
 
 But this statute authorizing a trust company to deposit trust funds in another department of its bank is in derogation of the general law of trusts and must be strictly construed. It may be noted that a trustee had, at the time the Binder trust was in the hands of the bank, authority to invest trust funds in land trust certificates. Section 710-140, General Code (108 Ohio Laws, 116, and 114 Ohio Laws, 534). But this section was amended in 1937, withdrawing the authority to make such investments. (117 Ohio Laws, 424.) In the instant case the will of Henry Binder, after providing for the trusts in question and naming the bank as trustee, gave the trustee express authority in Item VI as follows:
 

 “During the entire term of this trust, my said trustee and its successors shall have the full control and management of the trust estate, with authority to sell, invest and reinvest the same or any part thereof, at such times, in such manner and for such amount as it deems advisable and for the best interest of my said estate, the • reinvestments to be subject to the same trusts as the original estate. My said trustee shall further be empowered to execute, acknowledge and deliver any and all instruments in writing advisable or necessary to the proper performance of its duties hereunder; and the powers herein given my said trustee may be exercised by it without the intervention or order of any court, and nothing hereinafter contained shall be construed as limiting said powers.”
 

 But it must be observed that self-dealing or breach of good faith on the part of a trustee, as distinguished from his failure to observe statutory directions as to the character of investments
 
 (Willis, Admr.,
 
 v.
 
 Braucher, Gdn.,
 
 79 Ohio St., 290, 87 N. E., 185), cannot be excused on the ground that the instrument creating the trust and making him trustee has given him broad authority and unlimited discretion in the administration of the trust. The trustee cannot take
 
 *44
 
 advantage of liberal provisions of a trust instrument to relieve him from the legal responsibility of
 
 a
 
 fiduciary under the law.
 
 Roberts
 
 v.
 
 Michigan Trust Co.,
 
 273 Mich., 91, 262 N. W., 744;
 
 In re Will of Sibert,
 
 216 Iowa, 336, 249 N. W., 196.
 

 Having reviewed some of the legal principles involved in the transactions which are the subject of controversy in this case, we will now specifically apply such principles to each transaction more fully described, for the purpose of the decision of this case.
 

 In the Binder estate were fee ownership land trust certificates in the sum of $5,000 representing an undivided 5/4500 interest in the Michigan Office & Theatre Building Site, located in Detroit, Michigan. The original issue of these certificates totaled 4,500 shares. The Guardian Trust Company, itself, on or about March 15, 1927, purchased 4,495 of the 5,000 shares of $1,000 par value each at 94%. It then transferred the entire number at a price of 95 to a joint account, composed of Tillotson & Wolcott Company and itself, of which the Tillotson & Wolcott Company was the syndicate manager. These joint operators then sold these shares to a banking group composed of Blythe, Witter & Company, William R. Compton Company, Tillotson & Wolcott Company and The Guardian Trust Company, at a price of 95%. This banking group later sold the entire number of shares to a selling syndicate at 97% which disposed of most of them at par.
 

 The record shows that The Guardian Trust Company through its bond department disposed of 532 shares of these $1,000 certificates priced at par in most instances, and that its share in the profits of the syndicate was a net total of $62,080.77. On April 9, 1927, 13 of these certificates were transferred from the bond department of the bank to an account in the bank known as L. T. 1043, at a price of 97% or a total of $12,642.50. On the same day, five of these certificates were transferred from the L. T. 1043 account to the
 
 *45
 
 Binder trust at 97%. It is now claimed by the appellants that the profits on the transaction before the certificates went into L. T. 1043, as shown by the record, were compensation for services in making such certificates available as forms of investment for its trusts Including the Binder trust. This is a bold claim which this court cannot approve. The bank, having a beneficial ownership in these certificates, transferred them to itself at a profit and then placed a portion of them in the Binder trust. Clearly this transaction was tainted with the vice of self-dealing, profit-taking, underwriting and syndicate participation before the trust certificates in question came into the Binder trust. Under the circumstances, the transfer of these certificates to the Binder trust is indefensible and must be declared illegal and void.
 

 In the case of
 
 First Natl. Bank of St. Petersburg
 
 v.
 
 Solomon, supra,
 
 the court held that a national bank in selling securities held by it as trustee to itself as trustee of a second trust, upon which sale it received a commission, was guilty of a breach of trust. Judge Hutcheson, speaking for the court, said:
 

 “It cannot be too strongly stated that a bank named as trustee prostitutes its trust when it uses it as a feeder for promotional or speculative business; that it is a public and a private wrong for it to invest money left with it in trust in securities in which it is interested by way of commission, promotion, or profit. It cannot be too strongly stated that persons who, as appellee did, reposing confidence in a bank, intrust it with funds for safe and prudent investment, having absolute right to rely upon it that those funds will not be invested in securities, in the sale, promotion, or disposition of which the bank has an interest, immediate, contingent, or remote.”
 

 Restatement of Law of Trusts, 435, Section 170, comment
 
 h,
 
 on this subject, says:
 

 “The trustee violates his duty to the beneficiary if
 
 *46
 
 he sells to himself as trustee his individual property or property in which he has a personal interest of such a substantial nature that it might affect his judgment. It is immaterial that the trustee acts in good faith in purchasing the property for the trust, and that he pays a fair consideration. This is true whether he purchases for the trust property which he owns individually, or property owned by a firm of which he is a member, or property owned by a corporation in which he has a controlling or substantial interest."'’
 

 In this connection, Professor Austin W. Scott, in an exhaustive article on “The Trustee’s Duty of Loyalty,” in 49 Harvard Law Review, 521, 543, says:
 

 “It is sometimes contended that a trust company should be permitted to purchase securities for its trusts from its securities or banking department, because it is in a position to judge most wisely as to the value of such securities. If it always acted with an unbiased judgment, this might conceivably be so but the difficulty is that it is not in a position to exercise an unbiased judgment. In a sense the difficulties are greater than those which arise in the case of an individual trustee. An honorable individual trustee can hardly help seeing the direct conflict between his own interests and his duty to the beneficiaries. On the other hand, the officers of a trust company owe allegiance to the shareholders as well as to the beneficiaries, and the te'mptation to favor the shareholders may well be more insidious than the temptation of an individual trustee to favor himself. It seems clear in both cases self-dealing .is too dangerous to be permitted. It has been suggested that there is no harm where the trust company sells securities to itself as trustee if it makes no profit thereby, since in that case the beneficiaries are put in a better position than if the securities were purchased from third persons who would receive a profit. One objection to selling the securities at cost is that where the trust company has
 
 *47
 
 underwritten the securities it has usually agreed with the other underwriters not to sell at less than the price of the public offering. Quite apart from this, however, there is the danger that the trust company may make the trust estates a dumping ground for securities left on its. shelves.”
 

 At this point, the words of Justice Cardozo, when Chief Judge of the Court of Appeals of New York, in rendering the opinion of the court in the case of
 
 Meinhard
 
 v.
 
 Salmon, supra,
 
 at 464, are appropriate. He said:
 

 “Many forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the. punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ‘disintegrating erosion’ of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that troddened by the crowd. It will not consciously be lowered by any judgment of this court.” See, also,
 
 Piatt
 
 v.
 
 Longworth’s Devisees,
 
 27 Ohio St., 159, 195 and 196;
 
 Cox, Admr.,
 
 v.
 
 John,
 
 32 Ohio St., 532, 539 and 540;
 
 Caldwell
 
 v.
 
 Caldwell,
 
 45 Ohio St., 512, 522 and 523, 15 N. E., 297.
 

 There were $5,000 par value of Cleveland Hotel Building Site fee ownership certificates in the Binder trust representing a 10/7000 equal undivided share of equitable ownership in the land occupied by the Cleveland Hotel building and adjoining property. The. entire issue was put out by the bank as trustee of the trust and holder .of the fee in the land, and for these services the bank as trustee was to be paid out of the
 
 *48
 
 rentals an annual fee of $4,500 for the 99-year term of the lease. Tillotson
 
 &
 
 Wolcott Company, which was the original underwriter of the entire issue, sold the issue to a syndicate of which it, as well as the hank, was a member, at $495 per share. The bank took an allotment of 700 shares to sell so as to net a commission or profit of $10 per share on resale. In addition, the bank, on April 9, 1927, purchased at par and charged as an investment to the Binder trust, $5,000 or 10/7000 of the issue at par and accrued rentals. In May 1927, the bank received from Tillotson & Wolcott Company $7,000 “profit” on the block of 700 shares, and in June 1927 received from the same source an additional $3,071.25 designated on the books of the bank as a part of the same account a “balance of profit due us in full and final settlement of our interest in the special group and credited profits ’ ’ arising out of the same transaction. While the 10 shares in question were purchased for the Binder trust directly from Tillotson
 
 &
 
 Wolcott Company, yet the bank at the moment was a syndicate partner with Tillotson & Wolcott Company, and was participating in the syndicate profit on the sale of all shares by whomsoever sold, or the syndicate burden in case the shares could not be sold, which necessarily increased the price of the shares’ to the trust of which it was the trustee. In passing it might be noted that while the bank bought these 10 shares from Tillotson & Wolcott, yet in the same month it was selling a portion of its selling allotment of shares back to Tillotson & Wolcott Company. Here, again, is a clear case of self-dealing which must be condemned and the purchase declared illegal for reasons already noted.
 
 Magruder
 
 v.
 
 Drury & Maddox, Trustees, supra.
 
 This court is of opinion that the Common Pleas Court and the Court of Appeals erred in overruling the exceptions as to this item and the judgment of the Court of Appeals must be modified accordingly.
 

 
 *49
 
 In April 1924, the Franklin Construction & Realty Company of Columbus conveyed to the bank certain premises at the corner of Spring and Wall streets in the city of Columbus, upon which is located the Fort Hayes Hotel. The purchase price was $300,000 of' which $65,000 was represented by a mortgage assumed in the deal. The bank immediately executed a declaration of trust under which 300 land trust certificates of $1,000 each par value were issued to take up the purchase price. The bond department of the bank advanced to the trust department $200,000 for certificates which were purchased for and allotted to various trusts, and the other $100,000 was paid from funds in the bank for the remaining 100 of these certificates which were allocated to the trusts. The bank received expenses and an acceptance fee in the total sum of $9,456.92, and the trust instrument provided an annual fee of $360 per annum to the bank for its services as trustee. Certificates for $25,000 par value of the original issue were sold to the Backus estate and $5,000 of these were later transferred from this trust to the Binder trust at par. Here there was no self-dealing in or ownership of the certificates in question on the part of the bank. For reasons already given, since the record-does not disclose that the bank had any interest in the property, that the price paid was unreasonable, that the mortgage assumed was in distress, or that the acceptance fee for the organization of the trust or the annual fee for its management was excessive, no successful attack can be made on the legality of the transaction.
 

 The H. F. Neighbors Realty Company, in 1925, conveyed to the bank as trustee, real estate on Chester avenue in Cleveland, subject to four mortgages. The bank executed a declaration of trust under which 1000 land trust certificates of par value of $1,000 each were issued, reserving to itself an annual percentage fee which approximated $825. The entire issue was
 
 *50
 
 underwritten by Otis
 
 &
 
 Company for $955,000, one-half of which amount the bank took for sale. Two hundred of these certificates were taken by the bank at 98-3/4 and 300 certificates were taken by the bank’s bond department at an average of 96.66 or an average for the whole of 97%. The mortgage obligations to the amount of $703,129.92 were paid from the proceeds of the sale of the certificates. The disposition of these certificates was not made entirely to the trusts for which the bank was trustee. In fact, there were a number of sales made to individual parties at varying prices, large portions of the certificates being transferred to the account L. T. 1043 or the estate department. A sale of 16 units or shares was made to the Freehold Company at par and later one of these units of $1,000 was purchased by the bank as trustee for the Binder trust at par. The other unit of $1,000 held by the estate department was transferred to the Binder estate at 98-3/4. The three others of the five units transferred to the Binder trust were first sold to the Alice A. Dunn estate for which the bank was also trustee, and later transferred to the Binder trust at the same price. This issue was dated April 1925 and shows sales to various parties, and to L. T. 1043 at varying prices from November 5,1925, to June 8,1926. The sum total of this transaction is that the bank created the certificates, retaining from the rentals an annual compensation to itself during the life of the trust, became a partner in the underwriting for the sale of the certificates at a profit, and finally, by an indirect route, placed them in the Binder trust at an advanced price without disclosing its personal interest in the transaction or the benefits accruing to it therefrom. Needless to say, for reasons already stated, this transaction cannot be approved. Incidentally, this transaction shows not only what may happen in the conduct of the so-called trust account L. T.
 
 *51
 
 1043, but what actually did happen as affecting the trust in question.
 

 In 1924, the bank as trustee put out $304,000 par value land trust certificates on what is known in the record as the Chester-East 18th street property. The entire issue was purchased and paid for by the bank, the certificates from time to time being alloted to account L. T. 1043. The entire issue with the exception of a few sales to customers was later allocated to various trusts being administered by the estates trust department. Within two months, allocation of certain of these certificates had been made and the purchase price returned to the bond department of the bank. These certificates were transferred to the Grey, Miller and Dunn estates of which the bank was trustee. The trust instrument provided an annual fee to the bank of $175; the bank received from the owner $4,000 as an acceptance fee for putting through the deal; and paid in excess of $15,000 to itself to liquidate a mortgage which it held on the property. The balance of the proceeds of the sale of the certificates, less some expenses, was paid to the owners of the property or holders of liens against the interest of the owners. In 1928 and 1929, the trust department of the bank purchased back from the Grey, Miller and Dunn trusts, of each of which it was trustee, a total of $27,000 of these trust certificates and in turn transferred $5,000 of them at par to the Binder trust under date of April 16, 1929.
 

 The Euclid “Y” Corporation land trust certificates, 1922 in number of a par value of $100 each, were put out by the bank as trustee in the latter part of 1926, the entire issue being purchased by the bank. The ledger sheet of the bank shows that the entire issue was transferred to L. T. 1043 estate department at par between January 15, 1927, and October 8, 1927, from which allocations were made from time to time to various trusts. In 1924, The Guardian Trust Company
 
 *52
 
 had taken a mortgage on the property in question for $165,000, which on the same day was transferred to the Metropolitan Life Insurance Company without recourse. Another mortgage was taken by The Guardian Trust Company on the same and additional property, in the sum of $27,000, which was in default with past due interest in excess of $10,000. These liens were outstanding at the time the trust was created and were paid out of the proceeds of the sale of the certificates and from funds provided by a junior financing. The bank received from the owner an acceptance fee of $5,000 and the trust instrument provided for an annual fee to the bank of $576.60 for services in collecting rentals and looking after the property. The $5,000 certificates transferred from L. T. 1043 to the Binder estate were allocated to it at par on April 9, 1927.
 

 The Taylor-Square Realty Company property was taken over by the bank for a purchase price of $150,-000 with a 99-year lease back to the seller who agreed to pay a rental of $9,000 per annum for the first 10 years and $13,500 per annum thereafter. The money to purchase the property was advanced by the bank. On November 1, 1924, the bank, to reimburse itself for the purchase price, put out on this property an issue of 150 land trust certificates of $1,000 par each. The bank as trustee reserved a fee of $450 per annum, and paid for legal services the sum of $900. No acceptance fee was taken. On November 22, 1924, the bank transferred to the Binder estate 10 of these trust certificates at par amounting to $10,000. The other certificates were allocated te other trusts of which the bank was trustee, or in a few instances sold to customers on or before February 17, 1925, and the bank reimbursed. These allocations and the few sales are all shown on a single ledger sheet of the trust department and did not go into the L. T. 1043 account of the bank. In other words, they were actually allocated to the trusts or to the purchasers.
 

 
 *53
 
 The Court of Appeals as well as the Common Pleas Court sustained the exceptions as to the last four above-named issues of land trust certificates, for the reasons that the bank took over these securities and paid for them, but failed to ear-mark them for any particular trust until a later date; that there was no resolution spread on the minutes of the bank board or committee or any record made, showing that the certificates were purchased for and were the property of any trust; that on the contrary the certificates were held by the bank generally in the trust department or a pool account known as L. T. 1043 until they were later allocated to some trust in the bank for which it was trustee; that as a result of this practice, the bank, until the trust certificates were so allocated, was, in fact, the beneficial owner of them; and that as a consequence the subsequent transfer of the certificates to the individual trusts constituted a sale of the property of the bank to itself as trustee.
 

 The record sustains this position. It is replete with indisputable evidence from which it must be inferred that the bank in the first instance became the owner of these securities. In each ease the purchase of the certificates, was made by the bank with its own money. It now claims that the money was advanced by it for the Binder and other trusts, but there is no record that the bank loaned any money to the Binder trust or to itself as trustee of such trust with which to make such purchases; no record of any obligation from the Binder trust to the bank for such loan; nor is there any record in the Binder estate that any loan was ever paid back to the bank to reimburse it for such advance.
 

 The so-called interdepartmental transactions of the bank were not effective to hold the title to these certificates in suspense until they were allocated to the Binder trust, as is sought to be shown by the superintendent, for the reason that these departments were not independent legal entities. They were, in fact, the
 
 *54
 
 bank. The trust agreements executed in each instance by which the bank became trustee for the several issues of securities provided, not that the trust was for the benefit of any trust estate, but for “such persons, partnerships or corporations as may become parties hereto by the acceptance of land trust certificates of equitable ownership issued hereunder, hereinafter called beneficiaries.” The bank retained the power and authority to sell these certificates to any purchaser and did sell many of them to persons other than the trusts for which it was trustee. The bank itself received and retained the income which accrued on these certificates up to the time they were allotted to the respective trusts. The bond department kept a ledger sheet pertaining to each security issue, which sheets contained a complete record of each and all of the certificates sold or transferred. On the margin of each sheet appeared the notation, “Record of securities owned The Guardian Trust Company.” The evidence shows that there was profit manipulation in favor of the bank in at least one issue of certificates even after they were allocated to account L. T. 1043. On the same day that the trust department purchased certificates in the H. F. Neighbors Realty Company trust issue at 98%, one of which was later charged to the Binder account at the same price, the bond department of the bank was purchasing other of such certificates at a lower price; and in several cases when these certificates were transferred from account L. T. 1043 to trusts other than the Binder trust, the transfer was made at an increased price and the bank actually took down for itself from this account the profit thus made. To do this the bank must have been the owner'of the certificates in account L. T. 1043 at the time they were transferred to the trusts in question, and this, likewise, applied to any and all certificates which were passed through account L. T. 1043.
 

 It is significant that the whole of any issue of such
 
 *55
 
 securities was not transferred immediately upon issue to the pool account, but the certificates were transferred from time to time, evidently as the securities were needed for the various trusts. In the case of the Taylor-Square Realty Company, the Chester-East 18th street and Euclid “Y” Corporation properties, the certificates were all sold or transferred to the Binder trust at par. However, in the case of the Neighbors Realty Company certificates, the ledger sheet shows sales or transfers at varying prices even to the trusts for which the bank was trustee.
 

 These securities not having been allocated to any trust by declaration or segregation at the time of their purchase undoubtedly became the property of the bank. If there had been a loss suffered in these securities before allocation, that loss undoubtedly would have been the loss of the bank and not that of the trusts. If the bank had become insolvent before the allocation and transfer, the securities would have been assets of the bank’s estate and not assets of the several trusts for which it claims to have purchased them. Unless the bank, upon acquisition, places securities in such shape or form by allocation and transfer that it ceases to have any power to dispose of them to grantees other than its trusts, such securities must be regarded as the property of the bank. Applying these tests to the evidence presented by the record, we are of the opinion that the bank became the outright owner of the securities held by it in the account known as L. T. 1043 and in transferring them to its trusts transferred its own property.
 

 It will be noted that certain trust certificates, known as the Chester-East 18th street issue held in the Binder trust, were first sold by the bank to other trust estates for which it was trustee and some years later transferred from such estates to the Binder trust. The claim is now made that even if these certificates were originally owned by the bank and were sold to
 
 *56
 
 other trusts, the latter sale from such trust to the Binder trust was not a sale of the bank’s property, and for this reason the transaction is unimpeachable so far as the Binder trust is concerned. This claim is not tenable. If a trust-to-trust sale of a fraud-infected or breach-of-trust-infected security, made so by a sale to the first trust, exonerates the trustee or removes his guilt as to the second sale, the law against self-dealing is defeated. Such a rule would allow a trustee openly to sell his own property to one of his trusts and escape the consequences of his breach of trust by selling or transferring the property at the same price to another of his trusts. No beneficiary would have occasion to complain as to the original transaction, and no beneficiary could complain as to the second.
 

 The superintendent makes the plea that the law relating to the liability of a trustee to his beneficiaries must be liberalized in favor of the trustee because of modem methods and complexity in business as it is transacted at the present time. But the rules of law relating to the loyalty óf a trustee to his trust are, for the most part, constant and immutable, because they are grounded on the principles of honesty and integrity which are changeless and eternal.
 

 In the case of
 
 Nebraska Power Co.
 
 v.
 
 Koenig,
 
 93 Neb., 68, 77, 139 N. W., 839, the court, in discussing the rules of loyalty as applied to modem business, said :
 

 “The philosophy on which these rules of law and equity rest came down through the centuries from the Chancellor of Galilee. The wisdom and necessity of such doctrines become more apparent as the forms in which property is held multiply under new conditions, and as earning capital in the custody and control of agents or trustees follows new enterprises over the world, where it is not under the watchful eye of the owner. Courts of equity do not set bounds to the principles which control the conduct and fix the account
 
 *57
 
 ability of trustees. Tbe elasticity of these rules extends their applicability to all of the devices invented by unfaithful fiduciaries to evade their obligations or to defeat the imperative demands of business integrity and sound public policy.”
 

 The trustee bank, as we have found in this case, was guilty of disloyalty and breach of trust in profit-taking and self-dealing in certain of its transactions relating to the Binder trust. Under such circumstances, the beneficiaries through the successor trustee became optional creditors of the bank. They may retain the securities in the estate or rescind the transactions in question and file their claim as creditors of the defunct bank. Where, in a transaction relating to his trust, a trustee has been guilty of self-dealing or breach, of good faith, such transaction is voidable and the right of the beneficiary of the trust to rescind does not depend on whether the trust estate has suffered a loss. If a trustee purchases for the trust his own property or property in which he has a beneficial interest, he may be surcharged with any decline in the value of the property purchased for the trust, notwithstanding any claim that he has acted in good faith, and notwithstanding there may be no causal relation between his self-dealing and the loss or depreciation incurred.
 
 Piatt
 
 v.
 
 Longworth’s Devisees, supra; Caldwell
 
 v.
 
 Caldwell, supra; Wendt
 
 v.
 
 Fischer,
 
 243 N. Y., 439, 444, 154 N. E., 303; Restatement of Law of Trusts, 576, Section 210; 49 Harvard Law Review, 541; 3 Bogert on Trusts and Trustees, 1542, Section 489;
 
 St. Paul Trust Co.
 
 v.
 
 Strong,
 
 85 Minn., 1, 88 N. W., 256;
 
 Cornet
 
 v.
 
 Cornet, supra; In Matter of Long Island Loan & Trust Co.,
 
 179 N. Y., 520, 71 N. E., 1133, affirming 87 N. Y. Supp., 65; Restatement of Law of Trusts, 435, Section 170, comment
 
 h,
 
 and 560, Section 206, comment
 
 d; Larson
 
 v.
 
 Security Panic & Trust Co.,
 
 178 Minn., 209, 224 N.
 
 W.,
 
 235;
 
 Smith
 
 v.
 
 Tolversen, supra; First Natl. Bank of Birmingham
 
 v.
 
 Basham, supra;
 
 
 *58
 

 In re Guardianship of Arrak,
 
 218 Iowa, 117, 254 N. W., 307;
 
 Hodge
 
 v.
 
 Mackintosh,
 
 248 Mass., 181, 143 N. E., 43;
 
 People’s State Bank & Trust Co.
 
 v.
 
 Wade,
 
 269 Ky., 89, 106 S. W. (2d), 74;
 
 Potter
 
 v.
 
 Union & Peoples Natl. Bank of Jackson,
 
 105 F. (2d), 437.
 

 The superintendent claims that to allow a rescission of the transaction in question in favor of the Binder trust and the allowance of the claim for the amount of the original investment against the assets of the bank would result in an unjust enrichment of this trust at the expense of other creditors, and especially the depositor creditors of the bank. The bank conducted not only a banking department but several other allied departments in which it incurred obligations, suffered losses and made creditors. Among these are creditors of the trust department of the bank, and if the law awards to the Binder trust certain rights as a creditor, that trust is entitled to present its claim and participate in the distribution of the assets of the bank, the same as any other creditor in any department of the bank. The assets of the bank comprehend the assets of the trust department, including the' securities owned by it, all to be liquidated for the benefit of creditors generally. In this process there is nothing inequitable in allowing the Binder trust as a creditor to participate in a ratable distribution of assets,, for all are equally creditors and equality is equity. This is not a case where the trust estate is seeking a preference over other creditors.
 
 Stickle, Admr.,
 
 v.
 
 Guardian Trust Co.,
 
 133 Ohio St., 472, 14 N. E. (2d), 600;
 
 McDonald, Admr.,
 
 v.
 
 Fulton, Supt. of Banks,
 
 125 Ohio St., 507, 182 N. E., 504, 83 A. L. R., 1107.
 

 The judgment of the Court of Appeals, as modified in respects1 indicated by this opinion, is affirmed.
 

 Judgment modified and affirmed as modified.
 

 Weygandt, C. J., Day, Zimmerman, Williams and Matthias, JJ., concur.