Zimmerman, J.
 

 During the nineteen hundred and twenties particularly, it was the practice of a number of trust companies in Ohio to invest the funds of trust estates under their control in what are denominated as land trust certificates.
 
 Ipso facto
 
 investments of that kind were then lawful. These certificates represent an undivided interest in the equitable ownership of real property, legal title to which is held by a trustee for the benefit of certificate holders.
 

 The ordinary method of creation is for the owner of the legal title of the real estate selected to transfer it
 
 by-deed
 
 to a trustee, who simultaneously executes a long term lease, either to
 
 tbe
 
 owner, some other person, or sometimes to a corporation organized for the purpose of the transaction. Certificates of beneficial interest in a determined amount are then issued by the trustee under a declaration of trust and sold to investors. The rental stipulated in the lease to be paid to the trustee is fixed at a sum sufficient to produce a stated income, usually six per cent, on the certificates. Often a substantial stipend is paid to those organizing and financ
 
 *297
 
 ing the operation, and of course the trustee is paid for its services in managing the trust.
 

 As to the present ease, a majority of the members of this court is of the opinion that certain of the questions raised are governed by the principles announced in the recently decided case of
 
 In re Estate of Binder,
 
 137 Ohio St., 26, 27 N. E. (2d), 939, 129 A. L. R., 130, wherein this court proclaimed “undivided loyalty” as the cardinal standard for all trustees toward the trusts in their charge. In passing, it is of interest to mention that the judges of the Court of Appeals of the First Appellate District, sitting by designation in the Eighth Appellate District, certified the judgment they rendered as a court in the
 
 Binder case
 
 to the Supreme Court as being in conflict with the judgment of the Court of Appeals in the pending case.
 

 The exceptor-trustee, which will be referred to hereafter as appellant, asks a reversal of the judgment of the Court of Appeals on several grounds of alleged error. The first to be noticed relates to the holding in connection with the investment of $2,500 belonging to the Stone trust in certificates of participation in what is designated as Mortgage Trust Fund No. 1 of The Union Trust Company.
 

 In November of 1922 The Union Trust Company selected a quantity of its own mortgages and others held by it as trustee and placed them together in its mortgage loan department. It constituted itself trustee of the mortgages, withdrawing some and adding others from time to time. Participation certificates were issued against the mortgages and a number of such certificates sold to estates of which the bank was trustee, including the Stone trust. These certificates bore no stipulated rate of interest, the net income from the mortgages being apportioned to the different outstanding certificates. Believing this arrangement clearly constituted the sale of a trustee’s individual property to itself as trustee, within the inhibitions of the case
 
 *298
 
 of
 
 Ulmer
 
 v.
 
 Fulton, Supt. of Banks,
 
 129 Ohio St., 323, 195 N. E., 557, 97 A. L. R., 1170, the superintendent brought action in the Court of Common Pleas to have Mortgage Trust Fund No. 1 invalidated, and to that action the appellant here was a party.
 

 The issues thus raised, and in other cases which it is not necessary to mention, affected the common interests of the mortgage pool certificate holders as a class, including a number of individual certificate holders, and did not directly embrace the conduct of The Union Trust Company as trustee of the Stone trust in the investment of the trust funds. In other words, the general validity of the mortgage trust was involved in the proceedings before the Court of Common Pleas, while the precise claim of appellant in the Probate Court was that The Union Trust Company, as trustee, had committed an act of disloyalty in purchasing certificates for the trust representing property of which it was the owner.
 

 It was and is contended by the appellee, and was so found by the Court of Appeals, that any claim connected with Mortgage Trust Fund No. 1 is
 
 res judicata
 
 because of the litigation in respect thereto in the Court of Common Pleas. However, the questions presented in the Court of Common Pleas and the claim urged by the appellant in the Probate Court are so different in character as to make
 
 res judicata
 
 inapplicable. 23 Ohio Jurisprudence, 982, Section 749. Besides, under the provisions of Section 10501-53 (13), General Code, doubt arises as to whether any matter relating to the accounting of a testamentary trustee and touching the legality of the investment of trust funds, is not initially within the exclusive jurisdiction of the Probate Court.
 

 In our view, the Probate Court and the Court of Common Pleas were correct in recognizing and sustaining the exception as to the investment of money of the Stone trust in Mortgage Trust Fund No. 1.
 

 Next, we shall devote attention to certain invest-
 
 *299
 
 merits made by the trustee for the Stone trust which were validated by the Court of Common Pleas and the Court of Appeals, and which validation the appellant insists was erroneous. These were: (1) Two purchases of land trust certificates of The Altamont Realty Company issue from other trusts for $5,000; (2) An investment of $3,000 in land trust certificates of The Eddy Road-Euclid Company issue; and (3) Two investments in land trust certificates of The Willoughby Terminals Company issue — one of $3,000 and the other a purchase from another trust for $2,000.
 

 The three issues referred to were produced in the same general way. The Altamont Realty Company project was launched in 1919, when in August of that year land was conveyed to the Citizens Savings & Trust Company (succeeded by The Union Trust Company), and a ninety-nine-year lease executed to The Altamont Realty Company. However, no formal agreement or declaration of trust was made until 1931. On October 3, 1919, the bank paid $335,000 of its own money into an escrow account in its corporate trust department. $260,000 was used for the purchase of the realty and $75,000 transferred to a building account. On the same day, the property was placed on the books .of the bank as an asset at a value of $335,000. Until December of 1920, the bank held both the legal and equitable title in its individual capacity, and then began the sale of certificates of participation to different trusts of which it was trustee. This was completed about the middle of November 1921. In April of 1921, four of the Altamont shares of the face value of $1,000 each were sold to the Bissell trust, and in January of 1922 these identical shares were transferred to the Stone trust at the same value. The other $1,000 share was originally sold to the Ludwig trust, was then transferred to the Tarbell trust and finally reached the Stone trust. The Citizens Savings
 
 &
 
 Trust Company, as the title holder of the property, received the rent from the lessee as a part
 
 *300
 
 of its individual income and later, as certificates were sold to different trusts, the rental was prorated between the bank and the trust estates.
 

 From the part it took in the transaction, the bank profited to the extent of over $3,100 by way of fees.
 

 The Eddy Road-Euclid Company property, comprising an apartment and commercial building, was conveyed to The Union Trust Company on September 28, 1926, the bank expending $200,000 of its own funds in the purchase. A ninety-nine-year lease was then executed to The Eddy Road-Euclid Company. An “agreement and declaration of trust” was made and a land trust certificate issued which finally got into the sundry real estate department of the bank. The certificate was divided into a number of smaller units and in the latter part of October 1926 the bank began the sale of these participation certificates to the trusts of which it was trustee. Three certificates of $1,000 each were sold to the Stone trust on January 28, 1927. In December of 1926 a rental distribution took place, the bank keeping the proportion represented by the interest then held by it and distributing the balance proportionately among the trusts to which certificates had been sold.
 

 From its participation in The Eddy Road-Euclid Company transaction the bank received $3,350, and in addition collected an annual compensation of $280 for acting as trustee of the issue.
 

 The "Willoughby Terminals Company project was quite similarly carried out. Property owned by the Cleveland, Painesville
 
 &
 
 Eastern Railroad Company was conveyed to the bank on September 21, 1926, for the- terminal company which took a land trust certificate and resold it to the trust company, the purchase price being $160,000. A ninety-nine-year lease was executed to The Willoughby Terminals Company, followed by the usual “agreement and declaration of trust.” A division of the certificate into units was
 
 *301
 
 made and on October 1, 1926, they were all sold to trusts of which the bank was trustee. Three certificates valued at $1,000 each were sold to the Stone trust, and two of the same value to the Tarbell trust. Later these two last-mentioned certificates were transferred to the Stone trust at the price of $2,000 plus accrued rental.
 

 For its role in this transaction the bank profited to the extent of $5,000, less some expense, plus a fee of $224 per year for performing services as trustee of the issue.
 

 Pointing to the fact that the bank owned the securities sold to the trusts are the following indicia: The bank used its own funds in the various purchases made and it cannot fairly be said that this constituted a loan or advance to any particular trust or trusts; the bank possessed the power to dispose of the certificates as it pleased, according to language used in the various trust agreements which provided that the trusts should be for the benefit of such persons, partnerships or corporations as might become parties thereto by the acceptance of land trust certificates of equitable ownership issued thereunder; income on the certificates was received by the bank and they were carried on the books of the bank as assets; when certificates were transferred to a particular trust, the bank’s records were marked, participation sold.
 

 To offset the claim of bank ownership, the appellee points to the resolution of the bank’s trust committee and to certain memoranda designated as allocation or reservation sheets. As we analyze them, the resolutions did no more than authorize the corporate trust department to accept the trusts and act as trustee for the land trust certificate issues, and to place the certificates of participation on the list of approved investments for the various trusts, such as the Stone trust, of which the bank was trustee. And despite the interpretation given the allocation sheets by the appellee, it
 
 *302
 

 is
 
 hard to escape the conclusion that the ownership of the certificates was actually in the bank until such certificates were definitely assigned to specific trusts and the funds of such trusts paid over.
 

 The appellee urges that the land trust certificates of The Altamont Realty Company which came to the Stone trust directly from the Bissell and Tarbell trusts, respectively, and the certificates of The Willoughby Terminals Company which came to the Stone trust from the Tarbell trust, constituted trust-to-trust transactions and, being fair to each trust concerned, cannot be successfully attacked.
 

 This same question was dealt with in the
 
 Binder
 
 case, and it was there asserted that if a security is in: fected by a breach of trust at its inception, the vice carries through to later trust-to-trust sales.
 

 In the
 
 Binder case
 
 the general rule is laid down that a trustee violates his duty of loyalty if he buys securities in his individual name, in connection with which he has derived a profit, pays the purchase price out of his own funds and then makes distribution among the various trusts of which he is the trustee. Self-dealing by the trustee thereby occurs, which the law will not countenance.
 

 This may seem a harsh rule when applied to instances where there is no studied or deliberate design to do wrong and when the plan for the investment of trust funds is conceived and executed in good faith. However, the rule corresponds with most of the judicial pronouncements and with the best legal thought on the subject, and has been adopted by this court.
 

 Since a trustee is a fiduciary of the highest order and is charged with the utmost fidelity to his trust, he must refrain from creating situations where his own interests are brought into conflict with those of the trust, and from doing those things which would tend to interfere with the exercise of a wholly disinterested and independent judgment. In accepting a trust, the trustee
 
 *303
 
 is presumed to know the obligations and limitations connected with his high office and, if he transgresses, must abide the consequences.
 

 On the aspects of the case under immediate examination, it is our conclusion that The Union Trust Company perpetrated a breach of loyalty and engaged in self-dealing by investing the funds of the Stone trust in the land trust certificates of The Altamont Realty Company, The Eddy Road-Euclid Company and The Willoughby Terminals Company, and that appellant’s position in regard to the illegality of such investments must be. sustained. The judgment of the Probate Court as to these investments, insofar as it does not collide with this opinion, is approved.
 

 The next question for consideration is: Did The Union Trust Company as trustee of the Stone trust have the right to retain, and did it act with propriety in retaining, a large number of the shares of the capital stock of that company in the trust?
 

 In 2 Scott on Trusts, 884, Section 170.15, the following statement is made:
 

 “* * *
 
 it is improper for a corporate trustee to make an investment in the purchase of its own shares, even though the purchase is not made from.itself, and that it is improper for the trustee to retain such shares although it received them as original investments, unless it is authorized to do so by the terms of the trust or by statute.”
 

 And in 1 Restatement of the Law of Trusts, 664, Section 230, it is said:
 

 “Except as otherwise provided by the terms of the trust, the trustee is under a duty to the beneficiary within a reasonable time after the creation of the trust to dispose of any part of the trust property included in the trust at the time of its creation which would not be a proper investment for the trustee to make.”
 

 In respect to a corporate trustee, the underlying reason for these rules is obvious. Undivided loyalty
 
 *304
 
 being a primary obligation, the retention of its own shares in a trust presents the temptation and opportunity to the board of directors to use and manipulate such shares to advance its own interests or those of the corporation, with results which could prove detrimental to the trust and beneficiaries.
 

 No statute is directly applicable, so we turn to the will of Ella A. Stone creating the trust and read the following in Item XLIX:
 

 “Said trustee shall have absolute control of said trust estate, and shall handle, manage, lease, bargain, sell, transfer, convey, mortgage, encumber, allot, invest and reinvest the same or any part thereof upon such terms, under such conditions and in such securities as it in its discretion shall deem best, all statutory limitations and restrictions as to the investment of trust funds now in force and that may hereafter be enacted by the state of Ohio being hereby expressly waived by me * * V’
 

 This item certainly confers broad powers of investment and broad discretionary powers in the management of the trust estate, but there is no
 
 specific
 
 authority conferred to
 
 retain
 
 the bank stock. Is the quoted item then sufficiently comprehensive to justify the retention of the stock by the trustee, which otherwise, in our view, would be wrongful?
 

 We are frank to confess that the problem has given us concern, and. we have carefully and deliberately weighed the well-presented and ingenious arguments of counsel. Our studied conclusion, applicable to the instant case, is that a corporate trustee cannot acquire its own shares of stock as an investment, or retain its own shares in a trust, without
 
 express
 
 authorization by the terms of the instrument bringing the trust into existence, or by provision of law. Without such authorization, there is disregard for the duty of absolute faithfulness to the trust, because of the conflict which may and does on occasion arise between the personal
 
 *305
 
 interests of the trustee on the one hand and the interests of the trust and its beneficiaries on the other.
 

 Pertinent to the discussion is the language used in the tenth paragraph of the syllabus in the
 
 Binder case:
 

 “*
 
 * * breach of good faith on the part of a trustee * * # cannot be excused on the ground that the instrument creating the trust and making him trustee gave him broad authority and unlimited discretion in the administration of the trust.”
 

 In considering this aspect of the case we note that The Union Trust Company, as trustee, did not merely keep as an investment shares of bank stock owned by Ella A. Stone at the time of her death.. She died in 1920, possessed of stock in banks, in at least two of which her husband before his decease had held an official position, and which banks merged
 
 subsequent
 
 to her demise to form The Union Trust Company. The retention by The Union Trust Company, as trustee, of its own shares, issued to take the place of those of the merging banks is the controversial matter before us.
 

 During the early period in which The Union Trust Company, as trustee, held its own shares of stock in the Stone trust, there was opportunity to sell at a good price. That should have been done. In our opinion, the judgment of the Probate Court in favor of the appellant disposes of this phase of the controversy in a proper manner, and the disposition as there made is approved.
 

 Remaining to be decided are three less troublesome questions. It is contended that' the appellant is es-topped from challenging the conduct of the trustee in keeping the bank stock in the Stone trust, for the reason that the beneficiaries accepted benefits in the form of dividends. The proposition is elementary that to bind a beneficiary in a breach of trust, by acquiescence, it must be made to appear not only that he was aware of all the material facts, but that he was also advised of his legal rights and failed thereafter to register ob~
 
 *306
 
 jection. We do not discover anything tangible in the record to support the claim of estoppel.
 

 All three of the lower courts determined that the trustee was entitled to compensation, not being incompetent or chargeable with actual bad faith or fraud. Matters of this kind being largely discretionary with the court, we see no sufficient reason for disturbing the judgments below in this respect.
 

 As to all disapproved investments and on other amounts found to be due from the trustee, the Probate Court allowed interest at six per cent. This rate was reduced by the Court of Common Pleas to four per cent, and such latter rate was denoted as “just” by the Court of Appeals, and adopted. In circumstances like these involving a breach of trust, the fixing of the rate of interest at the legal rate, at the usual rate of return on trust investments, or at some lesser rate considered equitable and fair, is generally within judicial discretion.
 

 In these times of low returns on investments, four per cent ought to be satisfactory, and we think it would be an act of petty interference to order any change. Therefore, the interest rate will stand at the lower figure.
 

 The judgments of the Court of Common Pleas and of the Court of Appeals are reversed insofar as they conflict with this opinion, and the judgment of the Probate Court is affirmed subject to the alterations indicated herein.
 

 Judgment accordingly.
 

 Weygandt, C. J., Turner and Williams, JJ., concur.
 

 Hart, J., concurs in the syllabus and concurs in part in, but dissents in part from, the judgment.
 

 Matthias and Bettman, JJ., not participating.